Sixth and finally, we note that given the revival of some of Cornist's substantive claims, her Motion for Class Certification is likely no longer moot and that therefore the district court should decide the class certification issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0403P (6th Cir.)
File Name: 01a0403p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

KELLENA CORNIST and
DAVID JONES,
        *Plaintiffs-Appellants,*

            *v.*

B.J.T. AUTO SALES, INC.;
B.J.T. FINANCE, INC.; JAMES
HADLEY; BILL R. HATCHER;
THOMAS TEPE,
        *Defendants-Appellees.*

No. 00-5751

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 97-00041—William O. Bertelsman, District Judge.

Argued: September 19, 2001

Decided and Filed: November 16, 2001

Before: RYAN and BOGGS, Circuit Judges; and
WILLIAMS, District Judge.[*]

_____

[*]The Honorable Glen M. Williams, United States District Judge for the Western District of Virginia, sitting by designation.

_____

### COUNSEL

_____

**ARGUED:**   Candace J. Smith, ARNZEN, PARRY & WENTZ, Covington, Kentucky, for Appellants.   Jon D. Brittingham, DINSMORE & SHOHL, Cincinnati, Ohio, for Appellees.   **ON BRIEF:**   Candace J. Smith, ARNZEN, PARRY & WENTZ, Covington, Kentucky, Stephen R. Felson, FELSON & FELSON, Cincinnati, Ohio, for Appellants.   Jon D. Brittingham, Frank C. Woodside III, DINSMORE & SHOHL, Cincinnati, Ohio, A. Dennis Miller, Dennis Wood Van Houten, DRODER & MILLER CO., L.P.A., Cincinnati, Ohio, Gary J. Sergent, O'HARA, RUBERG, TAYLOR, SLOAN & SERGENT, Covington, Kentucky, for Appellees.

_____

### OPINION

_____

BOGGS, Circuit Judge.   Kellena Cornist and David Jones ("Cornist") appeal the judgment of the district court granting B.J.T. Auto Sales, Inc. ("BJT") summary judgment on all claims.   Cornist's federal claims arise under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*   Cornist alleges that BJT charged prices and fees to credit customers that were lower or non-existent for cash customers without disclosing the items as "finance charges."   Additionally, Cornist contends that BJT failed properly to disclose whether some of the fees were paid to third parties.   For the reasons set forth below, we affirm in part and reverse in part the district court's summary judgment.

### I

In 1996, Cornist purchased a 1987 Dodge automobile from BJT. The purchase was executed under a retail installment contract, and BJT assigned its interest in the contract to another defendant, B.J.T. Finance, Inc.

### D. The Liability of BJT Finance

Cornist also argues that BJT Finance, a co-defendant, ought to be held liable.   We share the Appellees' puzzlement regarding why Cornist dedicated space to arguing this issue.   Given our partial reversal of the district court's summary judgment on the merits of this claim, we remand to the district court to determine this question in the first instance.

### E. The Reinstatement of Cornist's State Law Claims

The district court dismissed Cornist's state law claims for lack of subject matter jurisdiction once it had dismissed Cornist's federal claims.   Given our reinstatement of some of Cornist's federal claims under TILA, we reverse the dismissal of the state law claims for lack of jurisdiction and remand to the district court for its determination of whether the exercise of supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367, is appropriate.

### III

We REVERSE in part and AFFIRM in part the district court's summary judgment for the defendants.   First, we reverse the district court's summary judgment that Cornist failed to demonstrate a genuine issue of material fact that BJT charged higher base automobile prices to credit customers because of the extension of credit.   On this point, we remand to the district court for further proceedings. *See* Part II.A.   Second, we affirm the district court's grant of summary judgment on all Cornist's federal claims regarding the service agreement fee. *See* Parts II.B.   Third, we affirm the district court's grant of summary judgment on Cornist's claims based on BJT's document fee. *See* Part II.C.   Fourth, we do not decide the unripe question of whether BJT Finance is a proper defendant, and remand to the district court to determine whether Cornist's claims against BJT Finance should be dismissed. *See* Part II.D.   Fifth, we remand to the district court to determine whether, in light of Cornist's reinvigorated TILA claims, the district court should exercise supplemental jurisdiction over Cornist's state law claims. *See* Part II.E.

Second, Cornist argues that the document fee was charged only to credit customers, and therefore was an undisclosed finance charge in violation of TILA. Although Cornist appears to have argued this point before summary judgment, the district court never resolved this factual issue. Instead, the district court held that the document fee represented "costs of doing business" that BJT was entitled to "pass on to consumers."

The district court's holding here does not completely resolve this matter. While businesses may certainly pass along the costs of doing business, TILA demands that the cost not be imposed on customers because of the extension of credit without being disclosed as a finance charge.[5] In this sense, the cost of processing sales documents is just as much a cost of doing business as the cost of the automobiles sold. To say only that the document fee represents a "cost of doing business" passed on to the customer does not resolve Cornist's legal claim under TILA.

While the district court's reasoning may have been inapplicable, its result was correct. A brief perusal of the cash sale file jackets provided by Cornist indicates that cash customers were regularly charged the document fee. These assessments of the document fee on cash customers, we hold, establish no genuine issue of material fact that the fee was assessed because of the extension of credit. Awarding summary judgment for the defendants on the ground that the document fee was not an undisclosed finance charge was appropriate. We therefore affirm the district court's summary judgment for the defendants on all Cornist's claims regarding BJT's document fee.

---

[5]The roots of this holding appear in the Federal Reserve Board's Official Staff Commentary to Regulation Z, interpreting TILA. *See* 12 C.F.R. § 226, Supp. I at 328. The Commentary suggests that "charges absorbed by the creditor as the costs of doing business" are not finance charges.

Cornist filed her complaint in this action on May 2, 1997, alleging that BJT had failed to make disclosures required by the Truth in Lending Act in connection with the purchase of her automobile from BJT. Cornist listed as defendants BJT, BJT Finance, and several owners of the two corporations. Among Cornist's Truth in Lending Act allegations were that BJT charged increased base prices for cars to credit customers without disclosing such increased prices as finance charges, failed to disclose the distribution of document fees and service agreement fees to third parties, and assessed those fees only on credit customers without disclosing them as finance charges.

Cornist sued individually and as representative of a class of individuals who had bought automobiles on credit from BJT. Later, Cornist filed a Motion for Class Certification.

After relatively contentious discovery proceedings, BJT and its co-defendants filed motions for summary judgment. In response, Cornist presented data on nineteen cash transactions for comparison to hundreds of credit transactions, while also noting that BJT had not produced documentation on over 139 cash transactions that Cornist had identified. Cornist compiled this data into a chart that compared, among other things, the "mark-up," or the premium over its cost of acquisition at which BJT sold automobiles, on each of the transactions. The mark-up appeared from the chart to be consistently and significantly higher for cars sold on credit.

The district court granted summary judgment for the defendants on all of Cornist's Truth in Lending Act claims. The court held that, in order to satisfy the legal elements of the Truth in Lending Act, Cornist must demonstrate a "systematic" disparity in pricing between credit and cash customers. At best, according to the court, Cornist's responsive evidence showed "sporadic rather than systematic" price increases for credit customers. The court similarly held that Cornist had not created any genuine issue of material fact that BJT violated any of the Truth in Lending Act's disclosure

requirements by its allocation of the service agreement and document fees.

Having dismissed all of Cornist's federal claims under the Truth in Lending Act, the court dismissed the remaining state claims for lack of subject matter jurisdiction, declining to exercise continuing supplemental jurisdiction over the claims. Additionally, the court held that Cornist's motion for class certification was moot, all her substantive claims having been dismissed.

## II

We are asked in this case to review a district court's summary judgment. This court reviews grants of summary judgment *de novo*, under the same standard as the district court. *See Owens Corning v. National Union Fire Ins.*, 257 F.3d 484, 490-91 (6th Cir. 2001). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a summary judgment, this court reviews the factual evidence and draws all reasonable inferences in favor of the non-moving party. *See B.F. Goodrich Co. v. United States Filter Corp.*, 245 F.3d 587, 591-92 (6th Cir. 2001). To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact. A mere "scintilla of evidence" will not suffice for the non-movant to overturn the summary judgment, but instead, the non-movant must show evidence "on which the jury could reasonably find for the non-movant." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, on which the claims in this case are based, was designed to increase the information available to consumers in credit transactions. TILA seeks to foster the "informed use of credit" by revealing the full price of credit to the consumer. *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356,

§ 1638(a)(3). *See* Part II.A. According to Cornist, "this $695 charge appears in credit sales only." However, Cornist points to no evidence that cash purchasers are not charged the service agreement fee. Moreover, at least fifty-seven of the credit customers in Cornist's study did not pay the fee. We agree with BJT that the service agreement appears to be more of an option, which credit or cash customers can either select or decline. Unlike the disparate percentage markup, which every customer would want to be lower, the evidence simply does not show that the distribution of the service contract fee was dependant on cash/credit status as much as desire for maintenance insurance. We therefore affirm the district court's grant of summary judgment for the defendants with regard Cornist's claims arising out of the service agreement fee.

### C. BJT's Document Fee

Cornist makes two similar arguments with regard to BJT's document fee. First, according to Cornist, BJT misrepresented that the document fee charged was being paid to "insurance companies," when in fact BJT retained the entire document fee. This claim, as a factual matter, is completely without merit. On the retail installment contract, there is a line for amounts "Paid to Insurance Companies." The line to the side of that entry is blank, presumably indicating that no amount was paid to insurance companies. Immediately below that line, there is an entry reading, "Paid to Doc Fee." The entry indicates the amount of $25. Again below is an entry reading "Paid to Public Official, 27.50."

This court is puzzled why Cornist thinks those entries indicate that the document fee was paid to insurance companies. A natural reading of the entries indicates that no money was paid to insurance companies. Asserting that the document fee was paid to insurance companies is just as absurd as claiming that the fee paid to public officials was paid to insurance companies. We sustain the district court's award of summary judgment on this point as no misrepresentation occurred.

the consumer. Here, the district court held and the parties do not dispute that BJT retained the continuing obligation to make repairs on the automobile under the Service Agreement. Accordingly, BJT's payment to First Extended did not create a contractual relationship between Cornist and First Extended, and therefore was not made on Cornist's behalf. The payment appears to be little more than BJT managing the administrative burdens imposed by its service agreement, while retaining the ultimate responsibility to perform under the agreement. Although the relatively small payment to First Extended may indicate that service agreements could have been more cheaply obtained by Cornist from vendors other than BJT, TILA does not protect the poor bargainer or the ill-informed. Just as TILA does not require a creditor to disclose the cost of goods sold, it also does not require BJT to disclose the cost of providing Cornist with continuing automobile service.

Cornist insists that other courts have found that TILA disclosure duties are triggered by these extended service agreement fees paid to third parties. However, the cases cited do not address the question of what it means for a payment to be made "on the consumer's behalf." *See Jones v. Bill Heard Chevrolet, Inc.*, 212 F.3d 1356, 1360 (11th Cir. 2000) (finding a TILA violation where dealer claimed that full amount of service contract was paid to General Motors, while retaining significant portion); *Green v. Levis Motors, Inc.*, 179 F.3d 286, 289 (5th Cir. 1999) (holding TILA violated where dealer claimed to have paid full amount to State of Louisiana, but retained portion). These cases merely stand for the uncontroversial proposition that a dealer cannot claim that a fee was paid to third party, when part of it actually was not. BJT never claimed that it was paying the service contract to a third party, thus the fact that it retained some of the fee is irrelevant. Additionally, BJT was not obligated to disclose that it paid some of the fee to a third party, because it was not paid "on the consumer's behalf."

Second, Cornist contends that the service agreement fee was an undisclosed finance charge in violation of 15 U.S.C.

364-65 (1973). Through requiring relatively uniform disclosures by sellers, TILA endeavors to enable consumers to evaluate credit offers separately from the purchase of merchandise, and thereby to create an active market providing more efficient credit prices. Although the disclosures undoubtedly increase transaction costs, TILA represents Congress's determination that those costs are outweighed by the benefits of the information produced. Because Cornist purchased her car through a retail installment contract, BJT was obligated to make the disclosures required by TILA.

Cornist's arguments against the district court's summary judgment on her TILA claims concern three categories of BJT's conduct. The first matter in dispute is BJT's pricing of its automobiles. Cornist argues that the evidence created a genuine issue of material fact with regard to whether BJT imposed higher automobile prices on credit customers "as an incident to the extension of credit," triggering BJT's disclosure responsibilities under TILA. Second, Cornist contends that summary judgment was inappropriate on several features of BJT's "service agreement fee." According to Cornist, BJT was required to disclose the partial allocation of the service agreement fee to a third party vendor. Additionally, Cornist asserts that the service agreement fee was imposed disparately on credit customers and was really an undisclosed finance charge in violation of TILA. Third, Cornist argues that the court incorrectly evaluated BJT's document fee. Cornist insists that BJT indicated that it had paid the document fee to third parties when in reality it had retained the fee for itself. Again, Cornist asserts that the document fee was imposed only on credit customers making it too an undisclosed finance charge. We discuss these categories of arguments separately below.

## A. BJT's Pricing Structure

Cornist argues that BJT violated the Truth in Lending Act by charging higher base prices for automobiles sold to credit customers than for those sold to cash customers, without disclosing the higher prices as finance charges. The Act

provides in relevant part: "For each consumer credit transaction other than an open end credit plan, the creditor shall disclose . . . [t]he 'finance charge,' not itemized, using that term." 15 U.S.C. § 1638(a)(3). The term "finance charge" is defined earlier: "[T]he amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. *The finance charge does not include charges of a type payable in a comparable cash transaction.*" 15 U.S.C. § 1605(a) (emphasis added). These provisions require sellers to disclose as "finance charges" fees payable by credit customers, but not by cash customers, in comparable transactions. Although there are certainly exceptions to this rule, none is relevant here.

This statutory language brings us close to the case at hand. An increase in the base price of an automobile that is not charged to a cash customer, but is charged to a credit customer, *solely because he is a credit customer*, triggers TILA's disclosure requirements. The problem of proof is that there could be many other reasons, to which TILA is indifferent, for a comparatively higher base price. One customer could be a better bargainer than another. TILA is not an affirmative action statute for those unskilled in negotiation. Consumer demand may appear higher to the seller when a particular buyer approaches than when others do. Accordingly, the comparison of two spot transactions, even on nearly identical cars, would do little to establish the reason why the credit customer paid a higher price. *See Gibson v. Bob Watson Chevrolet-Geo, Inc.*, 112 F.3d 283, 286 (7th Cir. 1997). In essence, to establish a TILA cause of action for an undisclosed finance charge, the plaintiff must demonstrate a "causal connection" between the higher price and the extension of credit.

This dilemma of proof is not unknown to the law. In our employment discrimination jurisprudence, we have discussed at length what type and amount of evidence will permit a

fee would be paid to First Extended. First Extended was never "idenif[ied]" by name. Indeed, BJT would be far from any violation if it had kept the entire fee for itself.

Even the omission of any reference to BJT's payment to First Extended is not a violation of TILA. TILA does not require that every payment made to a third party in connection with a transaction be disclosed to the customer, but only those payments to third parties that are made "on the consumer's behalf." 15 U.S.C. § 1638(a)(2)(B)(iii). BJT, if required to disclose every payment to a third party, would need to expose, for example, the amounts paid to the original owner to acquire the used car, parts distributors to recondition the automobile, or even the landlord for storing the car. TILA does not require a seller to disclose all its costs to a purchaser.[4]

Federal courts, however, have not been pressed to clarify what types of payments are those made "on the consumer's behalf." The distinction could be temporal: We might require sellers to disclose payments to third parties to be made *after* the transaction. In that case, the seller would not be required to disclose all of its costs, at least. But, we can find no textual basis in TILA for drawing such a temporal line.

The better approach lies in dissecting what it means for a payment to be made "on the consumer's behalf." A payment is made to a third party "on the consumer's behalf" when it creates a contractual obligation between the third party and

---

[4] Indeed, if TILA did require a seller to disclose all its costs to credit customers, credit customers would be asymmetrically advantaged in bargaining over price. In a well-functioning market, a credit customer with perfect information about the seller's costs should be able to bargain the seller down to marginal cost. A cash customer, uncertain of the seller's costs, might accept a higher price thinking incorrectly that he had bargained to the seller's marginal costs. We note that TILA does not even really require the seller to disclose its cost of extending credit, but only the price of extending that credit -- that is, the marginal difference from a cash transaction.

Requiring sellers to disclose all payments to third parties would essentially require the seller to disclose all his costs.

on the low side of the mean, and were statistically insignificant. But the consistent and sizeable gap between the cash and credit markups makes randomness sufficiently less likely an explanation that there is a genuine issue of material fact as to whether the enhanced markups for credit transactions were because of the extension of credit.

We therefore reverse the district court's summary judgment with regard to Cornist's claim that BJT was increasing the base price of automobiles for credit customers without disclosing such increases as finance charges.

## B. BJT's Service Agreement Fee

Cornist was charged $695 for a service agreement fee, which is something like an extended service warranty on the automobile purchased. The retail installment contract did itemize the fee: "Service Contract, Paid to: *695*." Cornist argues that BJT's handling of the service agreement fee violated TILA in two ways.

First, Cornist claims that the contract failed to disclose the party to whom the fee was ultimately paid, in violation of TILA. BJT paid $44 of the fee to First Extended Service Corporation. BJT retained the remainder, $651. First Extended agreed to process claims and to arrange for service to be performed pursuant to BJT's service agreements with its customers. BJT agreed to reimburse First Extended for any service that First Extended arranged to be performed under BJT's warranties.

TILA is not silent on whether sellers must disclose portions of the price paid to third parties. TILA requires that a creditor disclose "each amount that is or will be paid to third persons by the creditor on the consumer's behalf, together with an identification of or reference to the third person." 15 U.S.C. § 1638(a)(2)(B)(iii). Although Cornist complains about BJT retaining $651 of the service contract fee, as if it were presumed that the entire fee was being transmitted to a third party, her only potentially actionable complaint is with BJT failing explicitly to disclose that $44 of the service contract

finding that an adverse employment action was taken *because* of race or gender. What would certainly suffice for TILA is direct evidence: statements that the price was increased because the purchase was made on credit.[1] A plaintiff can also establish the reason for the price increase through circumstantial evidence. The question that we now face is what type of circumstantial evidence is sufficient to establish a genuine issue of material fact that a seller charges increased prices to credit customers *because* they are not cash customers.

The United States Court of Appeals for the Seventh Circuit has suggested that price increases should only be considered "finance charges" if they are "systematically" charged to credit, but not to cash, customers. *Gibson*, 112 F.3d at 286. The Seventh Circuit, the parties in this case, and the district court discuss this "systematic" quality as if it were a legal element of a TILA cause of action. We cannot find the word "systematic" anywhere in the statute. Instead, any consideration of "systematic" disparity is an evidentiary tool -- one way, but not the exclusive way, in which circumstantial evidence can tend to establish that a sum is charged a customer because he paid with credit.

When the evidence demonstrates a consistent difference in the base price for cash and credit customers, legitimate reasons for the individual price differences approach the vanishing point. While any particular cash customer may be, for example, a better bargainer than a particular credit customer, we would be hard pressed to say that all or nearly all cash customers are better bargainers than credit customers. Similarly, while market conditions may idiosyncratically increase the price for any particular customer, we cannot think of any reason why this economic fact would disproportionately befall the credit customer. We avoid the logical fallacy of equating correlation with causation by

---

[1] Of course, the statement would almost invariably need to be made to someone other than the customer because then it would amount to a disclosure, which is all that TILA requires.

making our statistical premise explicit. The evidentiary tool of seeking a systematic quality in the price disparity rests on the sensible premise that legitimate reasons for varying the base price do not consistently correlate with cash/credit status.

There are of course other ways to show that prices were increased because of the extension of credit. Absent disclosure, increasing prices because of the extension of credit is not permissible, even if undetectable, because the seller does so only occasionally. The Supreme Court, for example, has suggested that undisclosed finance charges might be established by comparing the price on identical products from two sellers, one selling only to credit customers.[2] There may be still others: thus, we emphasize that the "systematic" disparity requirement is not an element of a TILA cause of action for undisclosed finance charges, but a manner in which circumstantial evidence can be used to prove that a seller is burying the cost of credit in the price of goods sold.

We turn now to the circumstantial evidence in this case. Cornist, in response to the defendants' motion for summary judgment, prepared a study comparing BJT's cash and credit transactions. In that study, Cornist accumulated data from the "file jackets" prepared for each car sold. Among other items, the file jackets contained BJT's cost of acquiring a car, the ultimate price at which the car was sold, and whether the car was purchased using cash or credit.

The key measure of comparison in Cornist's study was the "markup" on the automobiles sold. The "markup," as used here, is the percentage increase in the base selling price over the price of acquisition. We would be reluctant to rely on claims that credit customers simply pay higher prices for cars. Consumers are buying different cars, which of course will be sold at different prices. The markups, on the other hand,

control for the car sold: a higher-priced car will likely have a higher acquisition price. Although market conditions may permit BJT to garner larger markups on some cars rather than others, no evidence has been presented thus far that this market phenomenon would affect cash and credit customers disparately.

BJT's markups for credit customers appear, on average, to be four to five times those for cash customers. At first blush, the idiosyncracies of consumers unrelated to credit/cash status that might lead to greater profits are unlikely to be the cause of such a consistent and wide disparity.

We recognize that the markup disparity could be susceptible to several explanations. BJT might establish a legitimate reason for the considerably lower markups in each cash transaction. No such explanations have been offered thus far in this case, and most such explanations would create genuine issues of material fact incapable of resolution on summary judgment.

The district court, in granting summary judgment to the defendants on this issue, was concerned that the cash sales constitute only a small percentage of the total sales in Cornist's study, or indeed of all BJT's sales. Cornist presented the district court with only nineteen cash sales over two years, compared to hundreds of credit sales.[3] It might well be the case that the nineteen cash sales are statistically insignificant, but we unable to hold that there is no genuine issue of fact as to their statistical insignificance. Undergirding our unwillingness to permit summary judgment on this point is the size of the markup disparity. If the nineteen cash sales had markups only a moderate amount lower than the mean markup, we might be more willing to hold that the nineteen cash sales were just random selections

---

[2] *See Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 367 & n.26 (1973). We note, however, that courts would likely want to control for comparative efficiencies that may also allow the cash seller to deliver the product at a lower price.

[3] We do not mean to say that Cornist withheld data from some cash sales from her study. Cornist identified from summary documents 139 BJT cash sales. However, after repeated motions to compel, BJT only produced the file jackets on nineteen cash sales.