Jamie **KILBOURN**, Plaintiff,

v.

**CANDY FORD–MERCURY, INC.**, Defendant.

Case No. 1:01–CV–142.

United States District Court, W.D. Michigan, Southern Division.

March 11, 2002.

122

Phillip C. Rogers, Grand Rapids, MI, for Plaintiff.

James E. Lozier, Lansing, MI, for Defendant.

## OPINION

QUIST, District Judge.

Plaintiff, Jamie Kilbourn ("Kilbourn"), filed this proposed class action against Defendant, Candy Ford–Mercury ("Candy Ford"), a car dealership from which she purchased an automobile on credit. Kilbourn claims that Candy Ford violated numerous provisions within the Truth in Lending Act ("TILA" or the "Act"), 15 U.S.C. §§ 1601–1667f, the Michigan Pricing and Advertising Act ("MPAA"), M.C.L. §§ 445.351–.364, the Michigan Consumer Protection Act ("MCPA"), M.C.L. §§ 445.901–.922, the Michigan Motor Vehicle Installment Sales Contracts Act ("MVISC"), M.C.L. §§ 566.301–.302, the Michigan Motor Vehicle Sales Finance Act ("MVSFA"), M.C.L. §§ 492.101–.141, and the Michigan Credit Reform Act ("MCRA"), M.C.L. §§ 445.1851–.1864, when it charged her more than the advertised price for the vehicle. Count Eight of Kilbourn's First Amended Complaint alleges that Candy Ford violated § 1638(b) of the TILA, which governs the form and timing of disclosures, by failing to provide her with cost-of-credit disclosures prior to consummation of the transaction.

Candy Ford has moved to dismiss Count Eight of Kilbourn's First Amended Complaint, and the parties have filed cross-motions for summary judgment on Kilbourn's TILA and her state law claims.[1] Candy Ford argues that Kilbourn's claim for statutory damages in Count Eight should be dismissed because statutory damages are not available for violations of § 1638(b) of the TILA. Candy Ford argues, in addition, that Kilbourn cannot show detrimental reliance, which is essential to actual damages in an untimely disclosure claim. As to Kilbourn's other TILA and related state law claims, Candy Ford asserts that Kilbourn cannot demonstrate that credit customers pay more than the advertised price for their vehicles because they are credit customers not cash customers.[2]

Also before the court is Kilbourn's motion for class certification. Kilbourn alleges that Candy Ford regularly sold vehicles to credit customers at more than the advertised price and hid this finance charge in the purchase price of the vehicles.

### Facts

On June 6, 2000, Kilbourn purchased a 1996 Pontiac Grand Am (the "Pontiac") from Candy Ford for $11,642.50. (Am. Compl. ¶ 13.) At the time, Candy Ford had advertised the Pontiac in Wheeler–Dealer magazine for $9,900.[3] (*Id.* ¶ 12.) Candy Ford gave Kilbourn a $500 rebate, resulting in an overall purchase price of $11,142.50, or $1,242.50 more than the advertised price. (*Id.* ¶ 17.) Kilbourn purchased the vehicle on credit, and she claims that the difference between the purchase price and the advertised price of the vehicle was a hidden fi-

---

1. At the hearing on these motions held on February 20, 2002, Candy Ford's counsel withdrew Candy Ford's contention that Kilbourn's untimely disclosure claim in Count Eight should be dismissed because Kilbourn failed to allege sufficient facts to support the claim. Candy Ford's counsel indicated that the remaining arguments in its motion to dismiss were incorporated into its motion for partial summary judgment.

2. Candy Ford asserts that since it did not violate the TILA's requirements, it is entitled to summary judgment on Kilbourn's claims for violation of the MVISC and the MVSFA because a creditor in compliance with the TILA is in compliance

with those statutes as well. *See* M.C.L. § 492.122a. In addition, Candy Ford contends that Kilbourn's claim under the MCRA is conditioned on a violation of the MVSFA and therefore that claim must fail as well. (*See* Am. Compl. ¶ 67.)

3. The parties dispute whether the advertisement Kilbourn alleges she took to Candy Ford was actually available at the location where she says she picked it up that day. This fact is immaterial because the car was advertised for $10,900 the previous week, which is still less than the purchase price of the vehicle.

nance charge that would not have been imposed on her if she had paid with cash. (*Id.* ¶ 34.) Kilbourn also alleges that Candy Ford did not give her a written copy of the required cost-of-credit disclosures to keep prior to entering into the sale. (*Id.* ¶ 19.)

On October 19, 2001, Kilbourn filed her First Amended Class Action Complaint, alleging that on multiple occasions Candy Ford charged its credit customers more than the advertised price for motor vehicles and failed to provide its credit customers with the cost-of-credit disclosures prior to consummation of the transaction. (*Id.* ¶¶ 1–2.)

### Analysis

The court will first address Candy Ford's arguments against Kilbourn's timely cost-of-credit disclosure claim and then will address Candy Ford's motion for summary judgment on Kilbourn's hidden finance charge claim under the TILA and related state laws. The court will then determine whether the action should be certified as a class action.

### I. Motions for Summary Judgment

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### A. Untimely Disclosure Claim

Count Eight of Kilbourn's Amended Class Action Complaint alleges that Candy Ford failed to provide timely cost-of-credit disclo-

sures before credit was extended and the transaction was consummated, as required by § 1638(b) and Regulation Z, 12 C.F.R. § 226.17(b). (Am.Compl.¶¶ 74–75.) Candy Ford argues that the TILA does not require it to give consumers a separate copy of the disclosures to keep prior to consummation of the transaction. Candy Ford contends that giving Kilbourn a written disclosure in the form of a retail installment sales contract ("RISC") for her review and then providing a copy of the RISC to keep after she signed it is sufficient to satisfy the requirements.

Section 1638(b) provides that, "[e]xcept as otherwise provided in this chapter, the disclosures required under subsection (a) shall be made before the credit is extended." 15 U.S.C. § 1638(b)(1). The applicable regulations contain the following disclosure requirements:

> (a) *Form of disclosures.* (1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep.
>
> \* \* \*
>
> ▇ (b) *Time of disclosures.* The creditor shall make disclosures before consummation of the transaction.

12 C.F.R. § 226.17(a), (b). The TILA is a remedial statute, and the court is to give liberal construction to the Act in favor of the consumer. *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 163 F.3d 948, 950 (6th Cir.1998).

▇ The court rejects Candy Ford's contention that the form and timing requirements do not work together to mandate that consumers such as Kilbourn be given a separate copy of the disclosures to keep before they sign the contract. That Kilbourn was allowed to review the applicable provisions and disclosures before signing the contract is not the same as being given a copy of the disclosures to keep and review prior to signing. *See Lozada v. Dale Baker Oldsmobile, Inc.*, 197 F.R.D. 321, 337 (W.D.Mich.2000)(holding that the regulation requires more than merely showing the disclosures to the consumer prior to signing the contract); *Polk v. Crown Auto, Inc.*, 221 F.3d 691, 692 (4th Cir.2000)(per curiam)(stating that "the plain meaning of the regulation

must be understood to be that written disclosure in the *form* specified in subpart (a) must be provided to the consumer at the *time* specified in subpart (b)"); *see also Walters v. First State Bank*, 134 F.Supp.2d 778, 781–82 (W.D.Va.2001)(holding that giving a consumer a written copy of the disclosures to review before signing and then providing a copy of those disclosures to keep afterward does not satisfy the regulation's requirements); *Holley v. Gurnee Volkswagen & Oldsmobile*, No. 00 C 5316, 2001 WL 243191, at *3 (N.D.Ill. Jan.4, 2001)(same). The purpose of providing a copy of the disclosures to keep is to enable the consumer "to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). Merely showing a copy of the disclosures prior to signing deprives the consumer of the opportunity to take a copy of the disclosures to another credit source, thus hindering the consumer's ability "to do some comparative shopping for credit terms." *Wachtel v. West*, 476 F.2d 1062, 1064 (6th Cir.1973). This is true even though, as Candy Ford notes, disclosures are typically made at the last possible time before consummation of the transaction, because even at that point the consumer can walk away and shop for better credit terms.

In arguing against this reading, Candy Ford notes that before the regulation was changed in 1981, the original language required that the consumer be given a "duplicate" of the disclosure statement at the time disclosures are made and that such disclosures must be made before the transaction is consummated. *See* 12 C.F.R. § 226.8(a) (1997). In addition to eliminating the requirement that a duplicate copy be provided, the regulation's form and timing requirements were split into separate paragraphs, suggesting, according to Candy Ford, that they were no longer to be read together. Finally, Candy Ford suggests that giving consumers a copy of the disclosures prior to consummation of the transaction in a form they can keep would place unnecessary costs on the lender without any additional benefit to the consumer. Therefore, Candy Ford argues, the requirements of § 226.17 are met if the consumer is given a written copy of the disclosures to review prior to signing, thus satisfying the timing requirement of subpart (b), and a copy of the same written document after signing it, thus satisfying the form requirement of subpart (a).

There is case law supporting Candy Ford's arguments. *See Nigh v. Koons Buick Pontiac GMC, Inc.*, 143 F.Supp.2d 535, 548–49 (E.D.Va.2001); *Spearman v. Tom Wood Pontiac–GMC, Inc.*, No. IP–00–1340–C–T/G, 2001 WL 1712506, at *3–5 (S.D.Ind. Dec.3, 2001); *Diaz v. Joe Rizza Ford, Inc.*, 210 F.Supp.2d 959–61 (N.D.Ill.2001). However, the court is persuaded by the reasoning in *Lozada* and *Polk*. The form and timing requirements cannot be separated as Candy Ford contends because they work together to bring about the purpose of the TILA. As the *Lozada* court stated, if "showing the disclosures to a consumer before consummation is sufficient to comply with the regulation, then either the consumer who may keep the disclosures would be rendered hypothetical or the timing for disclosure in the form *this* consumer may keep would necessarily be post-consummation, which is after the time required by § 226.17(b)." *Lozada*, 197 F.R.D. at 337. The plain meaning of the provision is that the written disclosures for the consumer to keep must be given prior to entering into the contract. Moreover, Candy Ford's reading of the regulation implies that the disclosures referred to in subpart (a), those that the consumer may keep, are different disclosures than those referred to in subpart (b), those that must be made prior to consummation of the transaction. This is inconsistent with and confuses the plain text because the entire section is concerned with general disclosure requirements. Finally, the court's reading is consistent with the policy of the TILA because this is the most favorable reading for the consumer, who will have the terms of credit in a form she can take with her and "can more readily compare those terms to the terms offered by other sellers." *Polk*, 221 F.3d at 692.

Candy Ford next argues that Kilbourn's claim for statutory damages should be dismissed because under the language of § 1640 of the TILA, statutory damages are not

available for violations of § 1638(b). Section 1640 governs the availability of damages for violations of various provisions of the TILA. Subsection 1640(a)(2)(B) establishes statutory damages for violations of § 1638:

> (a) *Except as otherwise provided in this section,* any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—
>
> > (1) any actual damage sustained by such person as a result of the failure;
> >
> > (2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction . . . or
> >
> > (B) in the case of a class action, such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same creditor shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the creditor;
> >
> > . . . *In connection with the disclosures referred to in section 1638 of this title, a creditor shall have a liability determined under paragraph (2) only for failing to comply with the requirements of section 1635 of this title or of paragraph (2) (insofar as it requires a disclosure of the "amount financed"), (3), (4), (5), (6), or (9) of section 1638(a) of this title, or for failing to comply with disclosure requirements under State law for any term which the Board has determined to be substantially the same in meaning under section 1610(a)(2) of this title as any of the terms referred to in any of those paragraphs of section 1638(a) of this title. . . .*

15 U.S.C. § 1640 (italics added). Section 1640(a) does not specifically state that statutory damages may be assessed for timeliness violations of 1638(b).

Candy Ford argues that the italicized part of § 1640(a) quoted above provides an exhaustive list of the provisions of the TILA whose violation may lead to statutory damages and that since § 1638(b) is not listed, no statutory damages are available for violations of that section. Candy Ford's interpretation of § 1640 is supported by a unanimous Seventh Circuit opinion in *Brown v. Payday Check Advance, Inc.*, 202 F.3d 987 (7th Cir. 2000), which affirmed this interpretation by three district judges. In *Brown*, the court emphasized the word "only" in concluding that statutory damages are confined to the enumerated list. *Brown*, 202 F.3d at 991. Since the TILA sections allegedly violated by the defendant were not on the list of violations eligible for statutory damages in § 1640, the plaintiff could not recover statutory damages for violations of those sections. *Id.* The plaintiffs argued that statutory damages are available for a violation of § 1638(b) because by definition such a violation is also a violation of various subsections of § 1638(a), which are on the list of violations eligible for statutory damages. The court rejected the argument because such a reading would essentially rewrite the statute by bringing candidates for statutory damages "in through the back door," resulting in universal inclusion that Congress clearly did not intend by specifically listing certain provisions and omitting others. *Id.* Finally, the court noted that the portion of § 1640 under consideration was added by Congress in order "to curtail damages awards for picky and inconsequential formal errors." *Id.* Second-guessing Congress' decision to include certain subsections and omit others was not appropriate. "[O]mission from the list means no statutory damages." *Id.* at 992. Judge Easterbrook, writing for the panel, concluded:

> We hold that § 1640(a) means what it says, that "only" violations of the subsections specifically enumerated in that clause support statutory damages, and that the TILA does not support plaintiffs' theory of derivative violations under which errors in the *form* of disclosure must be treated as *non*disclosure of the key statutory terms.

*Id.* Other courts have accepted this reading of § 1640. *See Molenbeek v. W. Mich. Auto

*& Truck Outlet, Inc.,* No. 1:00–CV–286, 2001 WL 1602654, at *5–6 (W.D.Mich. Mar.15, 2001); *Turk v. Chase Manhattan Bank USA, NA,* No. 00CIV1573CMGAY, 2001 WL 736814, at *2 (S.D.N.Y. June 11, 2001)(citing *Brown* and holding that statutory damages are only allowed for violations of enumerated sections in § 1640); *Nigh,* 143 F.Supp.2d at 549 (stating that under § 1640 there are no statutory damages available for violation of § 1638(b)); *Tripp v. Charlie Falk Auto,* No. CIV. 3:00CV512, 2001 WL 1105132, at *6 (E.D.Va. Aug.22, 2001)(same); *Peter v. Village Imports Co.,* No. 01–12–DSD/JMM, 2001 WL 1640130, at *3 (D.Minn. Oct.9, 2001)(same).

*Lozada v. Dale Baker Oldsmobile, Inc.,* 145 F.Supp.2d 878 (W.D.Mich.2001), however, explicitly rejects the *Brown* rationale. *Lozada* begins its analysis by noting the broad language of the first sentence of § 1640—that statutory damages are available for violations of " 'any requirement imposed' " by the TILA " 'except as otherwise provided.' " *Lozada,* 145 F.Supp.2d at 886 (quoting 15 U.S.C. § 1640). The list of specific subsections in the limiting provision is not, according to *Lozada,* "a positive and exclusive enumeration of provisions for which statutory damages are provided," but rather a "reverse description of *exceptions.*" *Id.* According to *Lozada,* § 1640 identifies particular subsections and, within those subsections, only certain provisions are eligible for statutory damages. *Id.* at 887. Subsections not identified remain subject to statutory damages under the general rule. *Id.* Accordingly, since § 1638(b) is not enumerated for exception, violators of § 1638(b) remain subject to statutory damages.

As an alternate theory of finding a right to statutory damages, *Lozada* reasoned that if a failure to deliver a timely disclosure is considered a "disclosure referred to in section 1638" within the meaning of § 1640, "then the failure to deliver disclosures in the manner provided by § 1638(b)(1) must be considered a failure to disclose the required terms under § 1638(a). The requirements of § 1638(b)(1) may not be considered 'disclosures' for purposes of § 1640 and yet not part of the disclosure requirements of 1638(a)." *Id.* at 889. In other words, no required disclosure was made if it did not meet the requirements of § 1638(b).

In deciding between these competing interpretations of § 1640, the court first notes that the *Lozada* court's alternative argument, as held in *Brown,* brings provisions "in through the back door" and would result in universal inclusion. This cannot be an appropriate result because it destroys the purpose of enumerating certain provisions and omitting others. *Brown,* 202 F.3d at 991. As to the primary argument, the *Lozada* decision seems inconsistent with the language of the statute, which refers to § 1638, not a subsection of § 1638, and then limits statutory damages "only for failing to comply with" the enumerated subsections. *See* 15 U.S.C. § 1640.

■ This rather simple interpretation, as recognized in *Brown,* is consistent with the legislative history of the TILA. The 1980 amendments were intended *to reduce the scope of creditor liability to violations which are central to understanding a credit transaction's costs and terms.* Congressional reports state the legislative intent to limit statutory penalties to disclosure of the amount financed; the finance charge; the total of payments; the annual percentage rate; the number, amount, and due dates of payments; any security interest; and, where applicable, the consumer's right of rescission.[4] These

---

4. This bill would narrow a creditor's civil liability for statutory penalties to only those disclosure [sic] which are of central importance in understanding a credit transaction's cost or terms. It is anticipated that this will eliminate litigation which is based on violations of a purely technical nature.

  In a 'closed end' transaction, such as an auto loan, the creditor's civil liability for statutory penalties would be limited to disclosure of the amount financed, the finance charge, the total of payments, the annual percentage rate, the number, amount, and due dates of payments, any security interest taken, and, where applicable, the consumer's right to rescission. This is a significant reduction from the current scope of liability.

  * * *

  Section 15. Civil Liability.—This section is intended to restrict the scope of creditor civil liability for statutory penalties to only those disclosures which are of material importance in credit

disclosure requirements correspond to those subsections listed in § 1640 as subject to statutory damages. *See* § 1638(a)(2)(A), (3), (4), (5), (6), (9); § 1635. Reading the limiting provisions of § 1640 as the court did in *Lozada* would permit the recovery of statutory damages for violations of "technical" requirements, which is what Congress intended to eliminate. *Brown,* 202 F.3d at 991–92.

For these reasons, the court will grant Candy Ford's motion for summary judgment on Kilbourn's claim for statutory damages and deny Kilbourn's cross motion for summary judgment on this claim. In addition, although Count Eight includes a claim for actual damages, Kilbourn's counsel admitted at the hearing that Kilbourn is not seeking actual damages under her untimely disclosure claim. Therefore, summary judgment will be granted to Candy Ford on Count Eight in its entirety.

## B. Hidden Finance Charge Claims

In addition to dismissal or summary judgment on Count Eight, Candy Ford also seeks summary judgment on Counts One, Four, Five, and Six, Kilbourn's hidden finance charge claims under the TILA and related state statutes.[5] Candy Ford also moves for summary judgment on Kilbourn's claim for unjust enrichment set forth in Count Seven. Kilbourn has moved for summary judgment on Counts One, Four, Five, and Six.

### 1. Undisclosed Finance Charge Claims[6]

Kilbourn alleges that she paid $1,242.50 more than the advertised price for her vehi-

cle and that this overcharge was an undisclosed finance charge imposed on her as a credit customer. Kilbourn alleges that Candy Ford thus violated the TILA by charging higher prices for vehicles sold to credit customers than for those sold to cash customers without disclosing the higher prices as finance charges.

Candy Ford responds by asserting that it has sold cars to cash customers for more than the advertised price and has sold cars to credit customers for less than the advertised price. Thus, according to Candy Ford, it does not engage in a policy or practice of charging credit customers more for their vehicles than cash customers. In addition, Candy Ford asserts that Kilbourn cannot show that credit customers pay more for their vehicles than cash customers *because* they are credit customers, as required for liability under the Act.

Under the TILA, a creditor such as Candy Ford must disclose the "amount financed", the "finance charge", and the finance charge expressed as an "annual percentage rate". 15 U.S.C. § 1638(a)(2), (3), and (4). A "finance charge" is "the sum of all charges, payable directly or indirectly by the person to whom credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction." 15 U.S.C. § 1605(a). The regulations promulgated in connection with the TILA,

shopping. The committee believes this will eliminate litigation based on purely technical violations of the Act. Civil liability for actual damages and administrative liability would continue to attach to all the Act's requirements.

In closed-end credit, a statutory penalty of $100 to $1,000 would attach only to rescission requirements and disclosure of the amount financed, finance charge, annual percentage rate, total of payments, number, amount, and due dates of payments, and the security interest statement. Thus, the creditor will not be subject to a statutory penalty for more technical requirements. S. Rep. No. 96–73, at 7, 17 (1979), *reprinted in* 1980 U.S.C.C.A.N. 280, 285, 294–95 (footnote omitted).

5. Count One alleges a claim under the TILA for failure to disclose a hidden finance charge. (Am. Compl.¶¶ 36–37.) Counts Four and Five allege claims under the MVISC and the MVSFA, respectively, for understating the finance charge and including the overcharge as part of the cash price. (*Id.* ¶¶ 53, 59.) Count Six alleges a claim under the MCRA for failing to properly disclose the finance charge under the MVSFA. (*Id.* ¶ 67.)

6. Compliance with the requirements in the TILA is compliance with the MVISCA and the MVSFA. M.C.L. § 492.122a. Moreover, Kilbourn's claim under the MCRA is dependent on a violation of the MVSFA. (Am.Compl.¶ 67.) Therefore, as both parties conceded at the hearing, Kilbourn's state law claims stand or fall with her claim under the TILA.

commonly referred to as Regulation Z, similarly define "finance charge":

The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

12 C.F.R. § 226.4(a). These provisions thus require sellers such as Candy Ford to disclose as "finance charges" fees payable by credit customers but not by cash customers in comparable transactions. In other words, "[a]n increase in the base price of an automobile that is not charged to a cash customer, but is charged to a credit customer, *solely because he is a credit customer*, triggers TILA's disclosure requirements." *Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322, 327 (6th Cir.2001). Thus, in order to prevail on her claim that Candy Ford failed to disclose this hidden finance charge, Kilbourn "must demonstrate a 'causal connection' between the higher price and the extension of credit." *Id.*

The problem for Kilbourn is one of proof. The court in *Cornist* compared the problem of proof in a suit under the TILA to a claim for employment discrimination. *Id.* at 327–28. Direct evidence that the defendant increased the price because the purchase was made on credit, like direct evidence that a plaintiff was fired based on gender or race or age, would certainly be sufficient. Typically, however, direct evidence, such as statements by an agent, are not present, and the plaintiff must rely on circumstantial evidence to make out her claim. One means the court identified is for a plaintiff to present proof of a systematic disparity between prices charged to cash and credit customers in comparable transactions. *Id.* at 328. "When the evidence demonstrates a consistent difference in the base price for cash and credit customers,

legitimate reasons for the individual price differences approach the vanishing point." *Id.* Where a defendant consistently sells comparable products to credit customers for a higher price than to cash customers, it is no longer viable to attribute the difference to bargaining skill or favorable market conditions because "legitimate reasons for varying the base price do not consistently correlate with cash/credit status." *Id.* Evidence of a systematic difference in price is not an element of a TILA claim; rather, it is one means of circumstantial proof. *Id.*

Kilbourn has presented both circumstantial and direct evidence that Candy Ford increased the purchase price to credit customers because they are credit customers. As circumstantial proof, Kilbourn identifies 58 transactions in the year 2000 in which a credit purchaser paid more than the advertised price for the vehicle.[7] (Ehlers Aff. Ex. D, Def.'s Br. Supp. Summ. J. Ex. 3.) The difference in price in these transactions ranged from $6,891 to $29.[8] (*Id.*) In response, Candy Ford presents evidence of two cash transactions in which the purchaser paid more than the advertised price and 15 credit transactions in which the purchaser paid less than the advertised price. (Ehlers Aff. Exs. A, B.) In addition, Candy Ford notes that in 19 of the 58 transactions identified by Kilbourn, the difference between the advertised price and the purchase price was the same as or less than the standard "dealer incurred charge" imposed by Candy Ford on both credit and cash customers. (Ehlers Aff. ¶ 16, Ex. C.)

◼ Kilbourn has failed to present enough circumstantial evidence that Candy Ford regularly charged credit customers more than cash customers and has thus failed to raise an inference that legitimate explanations like negotiating prowess or market conditions are not viable explanations. Kilbourn identifies only 39 transactions in the course

---

7. Submissions were limited to those transactions involving a vehicle with an identified stock number that was advertised at a specific price.

8. Candy Ford attempts to refute some of this proof by noting that in many of the transactions, the purchase price was less than the price listed in the Buyer Order Sheet. (Ehlers Aff. Ex. C.)

This is an inconsequential figure because the price listed on the Buyer Order Sheet is only the salesman's starting point for negotiation and was often higher than the advertised price of the vehicle. (Ehlers Dep. at 19–21, 67–68, Pl.'s Br. Supp. Summ. J. Ex. A.)

of a year in which a credit customer paid more than the advertised price without an explanation such as the standard "dealer incurred charge" common to both cash and credit customers. Candy Ford has identified 15 transactions in which a credit customer paid less than the advertised price for a vehicle.[9] There is no "consistent and wide disparity" between cash and credit customers as there was in *Cornist*, in which markups for credit customers were four to five times higher than markups for cash customers. *Cornist*, 272 F.3d at 329. The individualized differences among the identified transactions, including the negotiating skills of the customer, market conditions, and the purchase of additional accessories and services, still suffice to explain the disparity between cash and credit purchases of advertised vehicles in this case. Finally, the practice at Candy Ford was to permit the salesmen to haggle over the price of vehicles, and they were given great latitude in determining the final purchase price of the vehicles. (Ehlers Dep. at 20–22, Pl.'s Br. Supp. Mot. Summ. J. Ex. A.) The salesmen at Candy Ford did not always know whether a customer intended to pay with cash or on credit when negotiating over a vehicle's price, and the salesmen did not know whether the particular vehicle was advertised at a sale price. (*Id.* at 63–66.) This lack of knowledge suggests that those credit customers who paid more than the advertised price for their vehicles were not overcharged *because* they were credit customers, the central element of a TILA claim.

For direct proof in support of her claim, Kilbourn testified that she brought a copy of an advertisement for her car for $9,900 to Candy Ford and inquired whether that was the price she was paying for her car. (Kilbourn Dep. at 47–48, 53–55, Pl.'s Br. Opp'n Summ. J. Ex. A.) She testified that two of Candy Ford's salesmen, Mark Pellegrino and Armand Pellegrino, said that she was paying more than the advertised price for her vehicle because she had special financing needs. (*Id.*) Candy Ford contests this recitation of events. In an affidavit, Mark Pellegrino states that Kilbourn did not mention an advertisement or show him an advertisement when she purchased her car. (Pellegrino Aff. ¶ 11, Def.'s Br. Reply Ex. 4.) When Kilbourn called him later to inquire about the advertisement, he told her that there may be different Pontiac Grand Ams on the lot, not that she paid more because she purchased on credit or because of any financing needs. (*Id.* ¶ 12.)

■ This factual dispute is enough to preclude summary judgment for either party.[10] If Kilbourn was told that she was paying more for her vehicle because she was a credit customer, this would support her claim of a TILA violation under the standard set out by the Sixth Circuit. *Cornist*, 272 F.3d at 327–28. The fact that the statement was made to her and not a third party does not defeat its probative value because even if the statement were considered a "disclosure" made to her, it was not in the appropriate form nor was it accurate under the statute. *Id.* at 327, n. 1; 15 U.S.C. § 1638(a)(2), (3), and (4); 12 C.F.R. 226.17.

### 2. Unjust Enrichment

■ There is no dispute that Kilbourn and all members of the proposed class entered into retail installment sales contracts for the purchase of vehicles from Candy Ford. Unjust enrichment is not a viable claim under the circumstances. *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 883 F.Supp. 1101, 1112 (E.D.Mich.1995)(citing *Martin v. E. Lansing Sch. Dist.*, 193 Mich.App. 166, 177, 483 N.W.2d 656, 661 (1992)). Kilbourn's counsel conceded at the hearing that she was aban-

9. At the hearing, Kilbourn's counsel conceded that there are probably many more credit customers that paid less than the advertised price for the vehicle, but the exact totals are not known since many advertisements did not include vehicle stock identification numbers for comparison.

10. As will be explained in the section of this Opinion on class certification, while this factual dispute precludes summary judgment against Kilbourn, it defeats her argument for class certification because her factual proof—a direct statement that she was paying more because she was a credit customer—is different from that for the class she purports to represent. Thus, her claims are not typical of the class because she has direct proof for her claim, but this will not suffice to prove the claims for the class, and as noted, the circumstantial proof is inadequate.

doning this claim. Summary judgment will be granted to Candy Ford on Kilbourn's claim for unjust enrichment in Count Seven.

## II. Class Certification

The Supreme Court has required district courts to conduct a "rigorous analysis" into whether the prerequisites of Rule 23 are met before certifying a class. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982). Rule 23(a) "contains four prerequisites which must *all* be met before a class can be certified." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996). The movant bears the burden of proof. *Id.*

Kilbourn seeks certification of two different classes pursuant to Fed.R.Civ.P. 23(b)(2) and (b)(3). The first class relates to the claim that Candy Ford violated the TILA by charging credit customers more than the advertised price for vehicles and is proposed as follows:

> All consumers who executed a retail installment sales contract in connection with the purchase and finance of a motor vehicle from Candy Ford, Inc. and who were charged a price for the motor vehicle which exceeded the price of the motor vehicle as advertised by Candy Ford, Inc.

(Pl.'s Mot. Class Cert. at 2.) This class is limited to those consumers whose contracts were executed between March 2, 2000, and March 2, 2001, within the one-year period of limitation under the TILA. A second class is defined exactly as the first, but it includes all consumers whose contracts were executed during the six-year period preceding March 2, 2001, pursuant to the state-law period of limitation.

Rule 23(a) provides that a class may be certified

> only if (1) the class is so numerous that joinder of all parties is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These four prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of representation. The court will not certify Kilbourn's claims as a class action because she has failed to demonstrate numerosity and typicality.

### A. Numerosity

Numerosity exists where "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Whether joinder is impracticable depends on the particular circumstances of each case. *Weaver v. Reagen*, 701 F.Supp. 717, 721 (W.D.Mo.1988). Factors that a court may consider are class size, ease of identification of class members, and the ability of class members to pursue individual actions. *See Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir.1986). A plaintiff need not prove the number of class members to a certainty. *See Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 672 (N.D.Ohio 1995). The court may make common sense assumptions in examining the numerosity requirement. *See Vickery v. Jones*, 856 F.Supp. 1313, 1328 (S.D.Ill.1994). While not an absolute rule, it is generally accepted that a class of 40 or more members is sufficient to establish numerosity. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995)(stating that "numerosity is presumed at a level of 40 members")(citing 1 *Newberg On Class Actions, 2d,* § 3.05 (1985 ed.)).

In support of her claim for numerosity, Kilbourn identifies 58 transactions in which Candy Ford charged a credit customer a price for a vehicle that exceeded the dealership's advertised price for that vehicle. Of the 58 transactions identified, 42 fall within the one-year period preceding Kilbourn's filing on March 2, 2001, and come within the TILA one-year statute of limitations. The remaining 16 consumers fall within both classes. Kilbourn submits copies of 58 Applications for Michigan Title from Candy Ford customers in the year 2000, and she compares the purchase prices listed on those documents with the lower advertised prices

for the corresponding purchased vehicle.[11] (Pl.'s Mot. Class Cert. Exs. C, D.) Kilbourn contends that there are undoubtedly more than 58 overcharged consumers in that year, but her numbers are limited to those advertisements for which vehicle stock numbers are available for comparison with sales records. In many ads, no vehicle identification is available in order to compare its advertised price with the ultimate purchase price, and there is no way to know whether those vehicles were also sold to credit customers for a higher price than advertised. Kilbourn's discovery was also limited to transactions in the year 2000, and she has not yet investigated into the past six years.

■ Candy Ford notes that some of the proposed class members may have negotiated for other terms, conditions, accessories, or services that are reflected in the purchase price but have nothing to do with the transaction being a credit transaction with hidden charges. The problem is one of an overbroad class definition. *See Rockey v. Courtesy Motors, Inc.,* 199 F.R.D. 578, 584 (W.D.Mich.2001)(noting in a TILA hidden finance charge claim that the plaintiff's proposed class might include consumers who purchased an automobile from the defendant for business purposes rather than personal, household, or family use, as required under the Act). The definition of Kilbourn's proposed classes should be adjusted to indicate that the excess purchase price was a hidden finance charge for credit customers and not the result of additional consideration received by the purchaser. Kilbourn offers the following amended class definition:

> All consumers who executed a retail installment sales contract in connection with the purchase and finance of a motor vehicle from Candy Ford, Inc., and who were charged an "as is" price for the motor vehicle which exceeded the "as is" advertised price for the motor vehicle.

(Pl.'s Reply Br. at 7.) This definition eliminates from the class those who paid for accessories or services not reflected in the advertised price. The problem for Kilbourn

then becomes how many of the 58 credit customers identified as being overcharged were paying for the vehicle "as is". Kilbourn must demonstrate numerosity for this amended class, and she has not met this burden. For example, it is reasonable to assume that at least a few of the 58 customers identified by Kilbourn paid more than the advertised price for additional services or accessories, reducing the number of members of the proposed class. Moreover, in 19 of the transactions, the difference between the purchase price and the advertised price was the same as or less than the "dealer incurred charge", a $498 charge that Candy Ford tried to impose upon both cash and credit customers. (Ehlers Aff. ¶ 16, Ex. C.) These credit customers paid more than the advertised price for the vehicle, but they are not indicative of credit customers who paid a higher price *because* they were credit customers, which is what the TILA prohibits. *Cornist,* 272 F.3d at 327. For these reasons, Kilbourn has failed to demonstrate numerosity.

**B. Typicality**

Rule 23(a)(3) also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality "requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." *Belles v. Schweiker,* 720 F.2d 509, 515 (8th Cir.1983).

> [W]hen such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*Am. Med. Sys.,* 75 F.3d at 1082 (quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions,* § 3–13, at 3–76 (3d ed.1992)(omitting footnote)).

---

**11.** The advertised prices Kilbourn cites are those published in a flyer the week a particular vehicle

was purchased.

■ The problem Kilbourn faces with typicality is the type of evidence she offers in support of her claim. The court has already concluded that a question of material fact remains as to whether Candy Ford salesmen told Kilbourn that she was paying more for her car because she was a credit customer. The dispute over this alleged statement precludes summary judgment. This direct evidence is peculiar to Kilbourn, however, and supports only her individual claim of an undisclosed finance charge. This evidence does not support the claims of the class, and the events giving rise to Kilbourn's claim—that Candy Ford salesmen told her she was paying more for her vehicle because she had special financing needs—are not the same events that give rise to the claims of other class members. Therefore, Kilbourn and the proposed class members are not similarly situated.

In addition, the court has concluded that there is not enough circumstantial proof in the form of a systematic disparity between credit and cash customers to support the undisclosed finance charge claim. Out of presumably hundreds of transactions, Kilbourn could only identify 58 in which a credit customer paid more than the advertised price for a vehicle. The difference in price in these transactions ranged from $6,891 to $29, and in 19 of the transactions, the overcharge equaled a standard $498 charge imposed by Candy Ford on both credit and cash customers. (Ehlers Aff. Ex. C.) On many occasions, Candy Ford sold cars to credit customers for less than the advertised price of the vehicle. (*Id.* Ex. B.) It even sold cars to at least two cash customers for more than the advertised price. (*Id.* Ex. A.) These facts are not indicative of a pattern or practice of overcharging credit customers.

Therefore, proof of Kilbourn's claim will not be proof of the claims of the class, and Kilbourn has failed to demonstrate typicality.

### III. The MPAA and the MCPA

The court's supplemental jurisdiction over the Michigan Pricing and Advertising Act ("MPAA") and the Michigan Consumer Protection Act ("MCPA") claims, Counts Two and Three, is based upon 28 U.S.C. § 1367, which states in part:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, [or]
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, . . .

28 U.S.C. § 1367(c).

In deciding whether to exercise its supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir.1993)(affirming district court's order granting summary judgment on federal claim and dismissing state law claims without prejudice).

■ This court has not dismissed all federal claims over which it has jurisdiction, but Kilbourn's federal claims have been reduced to the point that she is left with a relatively minor personal claim because of statements allegedly made to her about why she was being charged more than the advertised price. On the other hand, Kilbourn's claims under the MPAA and the MCPA are still significant claims which substantially predominate over the federal claim over which the court has jurisdiction. The tail has started to wag the dog. In addition, these significant state law claims raise complex, and perhaps novel, issues of state law regarding the marketing, advertising, and selling of used motor vehicles in Michigan. For example, does a car dealer violate either act by advertising a car at a certain price without letting its salespersons know of the advertisements and giving the salespersons instructions to get the highest price possible? Or, does a car dealer violate either act by trying to impose a "dealer incurred charge"? What is a "dealer incurred charge"? Is the use of the term "incurred charge" false and mis-

**134**

leading when the dealer is really attempting to jack up the gross profit? These are important questions, but they are questions of state law—best resolved by state courts. Finally, automobile dealers are licensed by state licensing boards and the remaining state claims could impact upon the state licensing system.

Therefore, this court will decline to exercise supplemental jurisdiction over Kilbourn's claims under the MPAA and the MCPA in Counts Two and Three. Thus, the parties' cross-motions for summary judgment on those claims become moot.

### Conclusion

For the foregoing reasons, the court will grant summary judgment to Candy Ford and deny summary judgment to Kilbourn on the claim for untimely disclosure in Count Eight as to both statutory and actual damages. The court will also grant summary judgment to Candy Ford on Kilbourn's claim for unjust enrichment in Count Seven.

The court will deny summary judgment to both parties on Counts One, Four, Five, and Six of Kilbourn's complaint, representing her individual claim of an undisclosed finance charge.

The court will deny Kilbourn's motion for class certification.

The court will also dismiss the claims in Counts Two and Three under the MPAA and the MCPA, without prejudice, pursuant to 28 U.S.C. § 1367(c).

An Order consistent with this Opinion will be entered.