*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0331P (6th Cir.)
File Name: 03a0331p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————

E.I. DU PONT DE NEMOURS & COMPANY,

      *Plaintiff-Appellee,*

      *v.*

DR. JOHN JOSEPH OKULEY,

      *Defendant-Appellant.*

No. 01-3074

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 97-01205—John D. Holschuh, District Judge.

Argued: September 12, 2002

Decided and Filed: September 17, 2003

Before: BOGGS and COLE, Circuit Judges; and BELL,
Chief District Judge.[*]

_____

[*] The Honorable Robert Holmes Bell, Chief United States District
Judge for the Western District of Michigan, sitting by designation.

———————

### COUNSEL

**ARGUED:** Edward A. Matto, BRICKER & ECKLER, Columbus, Ohio, for Appellant. C. Craig Woods, SQUIRE, SANDERS & DEMPSEY, Columbus, Ohio, for Appellee. **ON BRIEF:** Edward A. Matto, BRICKER & ECKLER, Columbus, Ohio, Jerry K. Mueller, Jr., MUELLER & SMITH, Columbus, Ohio, for Appellant. C. Craig Woods, SQUIRE, SANDERS & DEMPSEY, Columbus, Ohio, for Appellee.

———————

### OPINION

———————

BOGGS, Circuit Judge. The defendant, Dr. John Joseph Okuley, appeals the summary judgment for the plaintiff, E.I. Du Pont de Nemours and Company ("DuPont"), in a dispute involving both contract and patent elements. Okuley helped discover FAD2, one of the genes encoding the Fatty Acid Desaturase enzyme, while an employee of Washington State University ("WSU"), which had a research collaboration agreement ("RCA") with DuPont that assigned to DuPont rights to intellectual property discovered in the course of the collaboration. When Okuley ceased cooperating with the processing of DuPont's application for a patent on FAD2, DuPont filed suit in the United State District Court for the Southern District of Ohio for a declaratory judgment that it owned FAD2 and for specific enforcement of Okuley's agreement to cooperate with DuPont. Okuley counterclaimed for a declaratory judgment that he was the inventor of FAD2 and to rescind his personal assignment of patent rights to DuPont. The district court granted summary judgment to DuPont on all issues. After initially appealing the district court's decision to this court, Okuley moved to transfer the appeal to the Court of Appeals for the Federal Circuit. We

take appellate jurisdiction of this matter and affirm the judgment of the district court.

## I

In 1991, Okuley, a Ph.D. in molecular biology, began work at WSU on a project on plant fat metabolism, with the aim of isolating and patenting genes that could increase the ratio between beneficial fatty acids and harmful saturated fats. Under the WSU Faculty Manual ("Faculty Manual"), employees assigned to WSU any intellectual property arising out of their employment, and WSU and DuPont were operating under the RCA regarding the assignment of the intellectual property arising out of this project. In August 1992, while still employed at WSU, but while working at a borrowed laboratory at Ohio State University ("OSU"), Okuley successfully identified the FAD2 gene and immediately informed both his supervisor at WSU and DuPont of his discovery. On November 17, DuPont initiated the patent process on FAD2. After some initial disagreement about the inventorship of FAD2, the issue was resolved in May 1993 by DuPont agreeing that inventorship was shared between Okuley and another WSU scientist and Okuley agreeing to assign to DuPont his "entire right, title and interest" in FAD2 and obligating himself to "execute all applications, papers or instruments necessary or required" for DuPont to obtain the patent. In December 1994, relations under this agreement between DuPont and Okuley broke down over Okuley's refusal to sign any more of the papers necessary for the patent application, unless he received "a reasonable royalty for the use of this invention." DuPont thereafter filed a petition with the Patent and Trademark Office ("PTO") to process the FAD2 patent application without Okuley's consent. At the time briefs in this case were filed, both the petition and the application were still pending, but on April 16, 2002, the PTO issued the patent litigated here.

On November 3, 1997, DuPont filed a three-count complaint against Okuley in the United States District Court for the Southern District of Ohio. Subject matter jurisdiction was based on diversity, DuPont being a Delaware corporation, with its principal place of business in Delaware, and Okuley a citizen of Ohio, and the matter in controversy meeting the jurisdictional amount. The first count sought a declaratory judgment that DuPont had exclusive ownership of the FAD2 gene, at least *vis-a-vis* Okuley. The second count sought specific enforcement of Okuley's contractual duties to continue executing documents necessary for DuPont to pursue the FAD2 patent. The third count sought the same relief on the basis of Okuley's common law duties. Okuley counterclaimed, seeking rescission of his personal assignment of FAD2 to DuPont and a judicial declaration that Okuley was the sole owner and inventor of FAD2. On November 1, 2000, after extensive discovery, the parties filed cross-motions for summary judgment on all counts. The district court granted summary judgment to DuPont on all issues. It concluded that it had no jurisdiction to entertain Okuley's claim to inventorship, that DuPont owned the rights to FAD2 under its agreement with WSU, that Okuley was bound by the Faculty Manual to assign all interests in FAD2 to DuPont; and that Okuley's personal, written assignment to DuPont was valid, enforceable, and not subject to rescission. Okuley timely appealed the district court's judgment to this court. After filing his proof brief in this court, Okuley moved to transfer the appeal to the Court of Appeals for the Federal Circuit, on the basis that it had exclusive appellate jurisdiction in this case.

## II

We first turn to the issue of proper appellate jurisdiction. This court has jurisdiction over almost all appeals from final decisions of district courts within its geographical boundaries. 28 U.S.C. § 1294. However, the Court of Appeals for the Federal Circuit has exclusive jurisdiction over appeals from final decisions of a district court, if the jurisdiction of that

court was based, in whole or in part, on 28 U.S.C. § 1338(a), subject to certain exceptions not applicable here. 28 U.S.C. § 1295. District court jurisdiction under § 1338(a) extends "only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988). The seemingly amorphous "substantial question of federal patent law" component of the test merely makes clear that a plaintiff cannot avoid federal patent jurisdiction by leaving out an element necessary to the success of his claim, any more than a plaintiff can create federal jurisdiction by including extraneous references to federal law. *Ibid.* Moreover, it is important to note that only inventorship, the "question of who actually invented the subject matter claimed in a patent," is a question of federal patent law. *Beech Aircraft Corp. v. Edo Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993). "Ownership, however, is a question of who owns legal title to the subject matter claimed in a patent, patents having the attributes of personal property" and is not a question of federal patent law. *Ibid.*

These principles are illustrated by *Rustevader Corp. v. Cowatch*, 842 F. Supp. 171 (W.D. Pa. 1993). In that case, Rustevader sued its former employee, Cowatch, and Cowatch's father in state court. The defendants had jointly taken out a patent and Rustevader demanded assignment of the patent under a breach of employment contract theory. The defendants removed to federal court on the basis of federal patent jurisdiction and Rustevader asked for remand on the basis that there was no federal jurisdiction. The court reasoned that if the suit had been filed exclusively against the former employee, the court could have ordered an assignment to the employer on the basis of contract, regardless of whether the son was the inventor, and a resolution of the inventorship issue would not have been necessary. However, the plaintiff also made a claim against the father, who was not in

contractual privity with the plaintiff. If the father was in fact, as the patent application claimed, an inventor of the disputed patent, Rustevader had no right to the assignment of his interest. If the son was the sole inventor and the contract assigned his rights to Rustevader, Rustevader had a right to the assignment of both father's and son's interest. Therefore, Rustevader's claim against the father required a resolution of the question of inventorship and unintentionally invoked federal patent jurisdiction.

This court has appellate jurisdiction if, and only if, DuPont's well-pleaded complaint necessarily requires resolution of the question of inventorship. The only claim in DuPont's complaint relevant to this question is the request for a declaratory judgment that DuPont had "sole title to [the FAD2] intellectual property." At first blush, to determine the validity of such a broad claim would appear to require resolution of the inventorship question, but a focus on the issues facing the court leads to the opposite conclusion. First, the district court only had the power to adjudicate the relative rights of the parties. Even if a hypothetical third party X had been the true inventor of the FAD2 gene, no judgment could have affected X's rights, as the district court never took personal jurisdiction over X. Therefore, the court needed concern itself only with the relative rights of DuPont and Okuley, regardless of the language of the complaint. The broad language of the complaint was extraneous to the resolution of the matter between the parties to the case. DuPont could not create federal patent jurisdiction by making the unnecessarily broad claim. Okuley cannot now use the overbreadth of DuPont's complaint to claim federal patent jurisdiction.

Second, as between Okuley and DuPont, the district court could have resolved the relative interests in FAD2 on several theories. For example, it could have determined that one of DuPont's other researchers was the sole inventor of FAD2 and that Okuley therefore had no right to the intellectual property. That would have required answering the

inventorship question. Alternatively, the district court could have reasoned, as in fact it ultimately did, that if Okuley was the inventor of FAD2, he contractually assigned all his interests to DuPont. That would not have required answering the inventorship question. If there are several alternative theories on which a claim may succeed, patent law jurisdiction is only invoked when *all* alternative theories necessarily state a complaint under the patent law. *Christianson*, 486 U.S. at 810.[1] As DuPont's assignment theory sounded in contract, not patent law, DuPont's claim to the sole ownership of the gene did not invoke patent law jurisdiction.[2] Therefore, appellate jurisdiction lies with this court.

A separate jurisdictional issue arises with respect to Okuley's counter-claim of sole inventorship, which the district court had dismissed for lack of jurisdiction.[3] In the

---

[1] The alternative rule, that federal patent jurisdiction is invoked whenever *any* of the theories on the basis of which a claim may succeed necessarily states a complaint under patent law, would eradicate *Beech Aircraft's* distinction between inventorship actions, arising under the federal patent law, and patent ownership actions, not arising under the federal patent law, as any patent ownership claim could hypothetically succeed on the basis that the claimant was the inventor, rather than the contractual purchaser of the invention. Such an alternative rule would also be contrary to *Christianson*.

[2] It is worth noting that, while of course subject matter jurisdiction is decided on the basis of the well-pleaded complaint and not the well-tried case, over the course of the four-year litigation there appears to have been absolutely no disagreement between the parties that Okuley was an inventor of FAD2. All issues in this case were decided solely on the validity and construction of agreements between the parties and the involved universities.

[3] Okuley's counter-claim does not affect the issue of appellate jurisdiction of the Federal Circuit. Even if he had standing to sue to clarify inventorship, still no federal patent appellate jurisdiction would exist, because Okuley's inventorship claims were *counter-claims*. "[A] counterclaim–which appears as part of the defendant's answer, not as part

---

proceedings below, Okuley had argued that the district court had been granted jurisdiction in two sections of the patent code.

> Whenever through error a person is *named in an application for patent* as the inventor, or through error an inventor is not named in an application, and such error arose without any deceptive intention on his part, the Director *may* permit the application to be amended accordingly, under such terms as he prescribes.

35 U.S.C. § 116 (emphases added).

> Whenever through error a person is named in *an issued patent* as the inventor, or through error an inventor is not named in *an issued patent* and such error arose without any deceptive intention on his part, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error. . . . *The court* before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director *shall* issue a certificate accordingly.

35 U.S.C. § 256 (emphases added).

We affirm the holding of the district court on the basis of the language of § 116 and § 256 and their notable differences. At the time of the trial and the briefs, no patent had yet been issued. Therefore, only § 116 applied. Section 116 does not mention courts, but rather gives discretion to the Director of the PTO to permit amendments to patent applications and to do so under such terms as the Director deems proper. Section

---

of the plaintiff's complaint–cannot serve as the basis for 'arising under' jurisdiction." *Holmes Group, Inc. v. Vornado Air Circulation Sys.*, 535 U.S. 826, 831 (2002). Hence a patent-law counter-claim does not create federal patent jurisdiction under § 1338.

256, by contrast, explicitly mentions the courts and the authority of the courts to compel action by the Director. Comparing these two sections, it is clear that Congress intended to draw a distinction between patent applications and issued patents. While the patent is still in the process of gestation, it is solely within the authority of the Director. As soon as the patent actually comes into existence, the federal courts are empowered to correct any error that the Director may have committed. Such a scheme avoids premature litigation and litigation that could become futile if the Director declined to grant a patent or voluntarily acceded to the claims of the would-be inventor prior to issue. We conclude, therefore, that the district court lacked jurisdiction to review the inventorship of an unissued patent.

After the briefs in this case were filed, the PTO issued a patent naming Okuley, among others, as inventor. While this may have created § 256 jurisdiction to review Okuley's inventorship claim, in reviewing the district court's judgment we consider the facts as faced by that court, without prejudice to a § 256 claim should Okuley choose to file such an action. In this appeal, Okuley has dropped any argument that § 256 was applicable and merely made a perfunctory statement that § 116 vests jurisdiction in the courts implicitly because "inventorship is a question of law." However, federal courts have not been granted jurisdiction to settle all questions of law.

### III

Having disposed of the somewhat thorny issues of federal patent jurisdiction, we now turn to the substance of the claims adjudicated by the district court and appealed here. These are questions of property and contract law and, as explained above, do not arise under federal law, patent law or otherwise. The district court's jurisdiction was based on the diversity of the parties. When sitting in diversity, a federal court applies the substantive law of the state. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Hence, our source of law with respect to

the contracts WSU entered with Okuley and DuPont in Washington is Washington law. With respect to the assignment executed in Ohio and the interpretation of Ohio statutes, the source is Ohio law.

The judgment appealed was a grant of summary judgment, so we apply the well-known summary judgment standard:

This court reviews grants of summary judgment *de novo*, under the same standard as the district court. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In reviewing a summary judgment, this court reviews the factual evidence and draws all reasonable inferences in favor of the non-moving party. To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact. A mere scintilla of evidence will not suffice for the non-movant to overturn the summary judgment, but instead, the non-movant must show evidence on which the jury could reasonably find for the non-movant.

*Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322, 326 (6th Cir. 2001) (internal citations and quotation marks omitted).

DuPont's claim of ownership to FAD2 rests on the basis of two contracts: the Faculty Manual and the RCA.[4] According to the Faculty Manual, WSU holds "ownership in patents and

---

[4] DuPont also argues that Okuley's personal assignment was legally valid and sufficient to transfer whatever interest in FAD2 remained with Okuley to DuPont. However, Okuley executed the assignment in reliance on DuPont's claims that he was legally obligated to do so. Whether these representations were accurate in turn depends on whether DuPont had a right to FAD2 before the assignment. Therefore this ground is not in fact independent and we do not reach it.

other non-patentable intellectual products . . . developed by its employees as a result of their employment." The parties do not dispute that this manual was a legally binding part of Okuley's employment contract with WSU. *See Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1087 (Wash. 1984) (recognizing that under Washington law employment manuals can give rise to contractual claims). Under the RCA between DuPont and WSU, WSU's interest in FAD2 was transferred to DuPont. In combination, these two contracts serve to transfer FAD2 from Okuley to WSU and from WSU to DuPont. Therefore DuPont owns FAD2. Against this conclusion, Okuley raises a series of objections.

Okuley's first and most novel objection is based on the fact that he discovered FAD2 while working under a WSU employment contract, but in an OSU laboratory and using OSU equipment. Under Ohio statutory law, "[a]ll rights to and interests in discoveries, inventions, or patents which result from research or investigation conducted in any . . . facility of any state college or university, . . . shall be the sole property of that college or university" Ohio Rev. Code § 3345.14(B). Therefore *ab initio* the ownership of FAD2 vested in OSU, not Okuley. Nevertheless, the Ohio statute did not abrogate Okuley's contract with WSU. Hence Okuley was also under an obligation to transfer FAD2 to WSU–an obligation he could not satisfy as at that time he did not own FAD2. Had matters rested in this posture, interesting, but quite different, litigation could have ensued involving WSU and OSU and including questions of the statute's constitutionality under the Takings Clause.

However, matters did not rest there. In 1993 , at Okuley's insistence, OSU–as apparently is its practice–explicitly waived its rights to FAD2. If OSU's waiver was effective, releasing any statutory rights that it enjoyed, the site of the research and the statute ceased to have any effect on this case. However, even if, as Okuley argues, the mandatory language of the statute prevents OSU from waiving its interest in FAD2, the outcome is no different because the "waiver" also

contained an assignment to Okuley of FAD2, an action undisputedly within OSU's power. This assignment enabled Okuley to fulfill his pre-existing contractual obligation to transfer FAD2 to WSU. Okuley argues that the assignment transferred FAD2 to him free and clear of any obligation. But even setting aside the question of whether OSU had the authority to void a contract to which it was not a party and executed in another state, the language of the assignment is unambiguous. The assignment clearly states that it was "subject to any rights of [WSU] or its research sponsor [DuPont]." Therefore Okuley's obligation to give FAD2 to WSU remained unaltered by the Ohio statute and the OSU waiver/assignment.[5]

Next, Okuley claims that if FAD2 became property of WSU under the Faculty Manual, WSU failed to follow the manual's procedures and thus forfeited it back to him.[6] The Faculty Manual states that if WSU's "Intellectual Property Committee fails to notify the employee in writing of determination of ownership within fifty days of full disclosure, . . . the University's rights in the patentable property shall automatically become the property of the employee." It is a disputed question of fact whether Okuley made full disclosure to WSU, triggering the clause in the Faculty Manual. But even if the clause was triggered, it will

---

[5] That Okuley was no longer an employee of WSU at the time the OSU waiver/assignment became effective is not relevant. Okuley's contractual obligation to give FAD2 to WSU, incurred during the lifetime of the contract, survived until fulfilled.

[6] Okuley now claims that his discovery was not covered under the Faculty Manual, because at the time of the discovery he was working at OSU and was using different methods than his WSU supervisor had suggested. However, it is undisputed that he was still an employee of WSU, using WSU and DuPont supplies, and working on the project that he had been given by his WSU supervisors. Moreover, he immediately communicated his success to his WSU supervisor and DuPont. Therefore, Okuley's claim of independence from WSU must fail. The Faculty Manual confirms this understanding.

not avail Okuley for several reasons. First, the Faculty Manual explicitly exempts property developed under an agreement with an outside sponsor from its return clause.[7] Second, the clause only vests WSU's rights back with the employee. However, under the collaboration agreement with DuPont, WSU did not have any rights in the property and only DuPont did. Therefore, WSU had nothing to return to DuPont.

Okuley also contends that the patent for FAD2 was based on additional "transformation work" that he performed after the end of the agreement between WSU and DuPont and that DuPont incorporated in later versions of its patent application. However, this transformation work was merely used to confirm the identity and use of FAD2 covered under the original patent application. As such it was, as the district court found, a simple extension of the original patent application and hence falls under the Faculty Manual's language regarding "intellectual products . . . developed by its employees as a result of their employment" and was assigned to WSU.

Okuley's final argument is based upon a reinterpretation of the RCA, to which he was not a party and with which all parties to the contract disagree. Under the RCA, almost all intellectual property rights arising from the research belongs to DuPont. However, under a clause of the RCA, if DuPont failed to isolate a gene resulting from the research within nine months of the identification, and WSU succeeded where DuPont had failed, the gene would belong to WSU and DuPont would merely receive a license. Using strained definitions of the conditions that start the nine-month period,

[7]Okuley raises the question that the collaboration agreement with DuPont was not a sponsorship agreement, because DuPont did not provide funds for the research. However, both WSU and DuPont construed the agreement as a sponsorship agreement and DuPont provided valuable consideration to WSU in the form of access to its database of genetic material.

Okuley argues that it had expired before he even began his research. According to DuPont and WSU, Okuley's discovery of FAD2 started the period and DuPont was able to isolate the gene almost immediately thereafter. Even if Okuley had standing to challenge the interpretation of a contract to which the parties agreed, and his interpretation were correct, which seems highly unlikely, the effect would be merely to vest the property in WSU, not Okuley. For Okuley to obtain the patent, the court would also have to agree with the above argument regarding the reversion of the patent to Okuley by inaction of WSU. As we do not, this issue is moot.

## IV

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.