Litéra Corp. v. Martinez, 2017 NCBC 34.

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

LITÉRA CORPORATION,

      Plaintiff and
      Counterclaim Defendant,

   v.

DENEEN L. MARTINEZ,

      Defendant, Counterclaim
      Plaintiff, and Third-Party
      Plaintiff,

   v.

KAREN KENEFICK-MASSAND and
RAINA MASSAND as Executrices of
the Estate of Deepak Massand,

      Third-Party Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 6387

**ORDER & OPINION ON PLAINTIFF &
THIRD-PARTY DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT &
MOTION TO STRIKE**

1.　THIS MATTER is before the Court on Plaintiff and Third-Party Defendants' Motion for Summary Judgment (the "Motion") and Motion to Strike. For the reasons discussed below, the Court DENIES the Motion as to Plaintiff's claims, GRANTS the Motion as to Defendant's counterclaims and third-party claims, and DENIES the Motion to Strike.

> *Brooks, Pierce, McLendon, Humphrey & Leonard, LLP by James T. Williams, Jr., Benjamin R. Norman, and Matthew B. Tynan, for Plaintiff and Third-Party Defendants.*

> *Nelson Mullins Riley & Scarborough, LLP by Mark Stafford and Carstens & Cahoon, LLP by Vincent J. Allen, for Defendant.*

Gale, Chief Judge.

# I. MATTER BEFORE THE COURT

2. Litéra Corporation ("Litéra"), founded by its former CEO Deepak Massand ("Massand"), employed Deneen Martinez ("Martinez"), pursuant to an employment contract that included hired-to-invent provisions. The parties dispute whether Martinez invented the virtual deal-room technology known as Wormhole Computing ("Wormhole"), and if so, whether she invented it before or while she was employed by Litéra. Litéra brings two claims asserting that Martinez improperly disclosed Litéra's proprietary information, including but not limited to the Wormhole technology, in her patent application. Martinez brings counterclaims and third-party claims asserting her ownership of Wormhole. The Motion challenges the Court's subject matter jurisdiction over Martinez's claims, contending that they arise under federal patent law.

# II. STATEMENT OF FACTS

## A. The Parties

3. Litéra is a software development company organized under the laws of New Jersey, with its principal place of business in McLeansville, North Carolina. Litéra creates products that allow users "to create, collaborate, compare, control and clean business documents." (Compl. ¶ 3; *see also* First Am. Answer of Deneen Martinez ("Am. Answer") ¶ 3.)

4. Massand founded Litéra and was its CEO until his death in 2015. (Domnick Aff. ¶ 3.) The executrices to his estate have been substituted in his place as the Third-Party Defendants in this action ("Massand's Estate").

5. Martinez was Litéra's Executive Director of Research and Development from August 1, 2011, until May 17, 2012. (First Am. Countercls. and Third-Party Compl. of Deneen Martinez ("Am. Countercls.") ¶ 13; Reply to Am. Countercls. and Answer to Am. Third-Party Compl. ("Reply") ¶ 13; Pl.'s Br. Supp. Mot. Summ. J. Ex. D.) Her job responsibilities included managing and working with the development team to fix problems with existing products and to create new products. Martinez resigned on May 21, 2012. (*See* Martinez Dep. Ex. 16; Martinez Dep. 80:15–21.)

B. <u>Martinez's Employment Agreement with Litéra</u>

6. Prior to her employment, Martinez read and signed the Litéra Policy and Employment Agreement ("Employment Agreement") and the Confidential Information and Non-Compete Agreement for Employees of Litéra, Corp. ("Confidentiality Agreement") (collectively the "Agreements"). (Martinez Dep. 46:7–47:10.) Martinez agreed not to "use, reproduce or commercialize, or disclose to any person or entity, any Confidential Information, unless specifically authorized by [Litéra] in writing." (Compl. Ex. A ("Confidentiality Agreement") § 1(a).) The Confidentiality Agreement defines "Confidential Information" as "all trade secrets, technical information, processes, computer programs, code, algorithms, formulas, . . . 'Employee Work Product' . . . and all other information which if disclosed to a third party could adversely affect a competitive advantage of [Litéra]." (Confidentiality Agreement § 1(b).)

7. The Confidentiality Agreement defines "Employee Work Product" as:

all Confidential Information created, developed, prepared or conceived of by [the] Employee (whether individually or jointly with others) during

[the] Employee's employment with [Litéra] which relates in any manner to the actual or demonstrably anticipated business, research or development of [Litéra], or results from or is suggested by any task assigned to [the] Employee or any work performed by [the] Employee for or on behalf of [Litéra].

(Confidentiality Agreement § 1(d).) The definition of confidential information specifically excludes any "information known to [the] [e]mployee prior to employment with [Litéra], as established by [the] [e]mployee by documentary evidence" and "information independently developed by [the] [e]mployee, as established by [the] [e]mployee by documentary evidence; provided, that such information is outside the scope of [the] [e]mployee's employment with respect to both the time spent developing and the subject matter of the information." (Confidentiality Agreement § 1(b).)

8. Martinez agreed that Litéra "is the exclusive owner of all Confidential Information" and that "all rights, title, and interests [in Employee Work Product], including, without limitation, all copyrights, patents and trade secrets, are . . . irrevocably assigned to [Litéra]." (Confidentiality Agreement § 1(c).) The Confidentiality Agreement requires Martinez, as part of her job duties, to "assist [Litéra] in obtaining patents," and to "execute all documents necessary to vest [Litéra] with full and exclusive title" to her work product. (Confidentiality Agreement § 1(c).)

9. Litéra's Employment Agreement reiterates that "[a]ll ideas generated while [the employee is] an associate of Litéra, in meetings or as a result of use or exposure to Litéra products or methods, inventions, improvements made to existing

Litéra products and offerings remain the intellectual property of Litéra." (Compl. Ex. B ("Employment Agreement"), at 5.)

C. **Martinez's Contentions Regarding the Creation of Wormhole**

10.     The parties dispute who created the idea for the virtual deal-room platform referred to as Wormhole, which was developed and incorporated into Litéra's software, Litéra Galaxy, during Martinez's employment.

11.     Conceding that she worked on Wormhole during her employment with Litéra, Martinez contends that she developed the concept for that technology before joining Litéra and only worked on that technology outside of her normal working hours with Litéra. (Martinez Aff. ¶¶ 2, 23; Martinez Dep. 50:17–51:19.) Specifically, Martinez contends that prior to her employment with Litéra she documented in her "Idea Journal" the idea for Wormhole, describing it as a "Virtual Dealroom platform" that would "provide[ ] for the storage of content in virtual memory rather than a temporary directory to allow documents to be securely shared across the firewalls of different entities." (Martinez Aff. ¶ 2.)

12.     In early December 2011, while working for Litéra, Martinez met with Thomas Zingale ("Zingale"), the Managing Director of Global Head of Legal and Compliance Systems and Strategic Planning for UBS, and Steve Grossman ("Grossman"), an independent contractor. UBS was a Litéra customer, but at that time, neither Zingale nor Grossman worked for, or had a consulting contract with, Litéra.

13.     Zingale testified that at this meeting he and Grossman disclosed their idea for the Wormhole technology to Martinez. (Zingale Dep. 27:5–28:11.) Martinez instead claims that she told Zingale and Grossman about her idea for that technology and asked for their assistance in creating a presentation to use in pitching the concept to Litéra. (Martinez Aff. ¶ 6.) She testified that she created the concept for Wormhole, that she and Zingale "collaborated on the details," and that Zingale and Grossman developed "[t]he marketing concept," including creating the name "Wormhole." (Martinez Dep. 134:8, 134:28, 135:19.) Martinez contends that, while she discussed the Wormhole concept with Zingale and Grossman, she did not disclose "the details of how to implement [it]." (Martinez Aff. ¶ 6.)

14.     Martinez never had Zingale or Grossman execute a confidentiality or non-disclosure agreement. (Martinez Dep. 140:24–141:25, 142:23–25.) Grossman emailed Martinez the first draft of a password protected PowerPoint presentation accessible to only Martinez, Zingale, and Grossman. (Martinez Aff. ¶ 8.) Martinez used her Litéra company computer to communicate with Zingale and Grossman and to work on Wormhole related documents. (Martinez Dep. 120:10–17.) Martinez now admits that the PowerPoint presentation disclosed a "step-by-step process of [her] invention." (Martinez Dep. 192:19–20.) Zingale's nephew created an animated video to demonstrate how Wormhole would operate. (Martinez Dep. 132:7–20.) There is no evidence that Zingale's nephew signed a confidentiality or non-disclosure agreement.

15.     Litéra claims that Massand first developed the concept for the Wormhole technology during a meeting with Martinez on December 27, 2011. (Compl. ¶ 16.)

**D. The December 27, 2011 Meeting between Martinez and Massand**

16.     Martinez and Massand met at Litéra's office in North Carolina on December 27, 2011. (*See* Compl. ¶ 16; Am. Answer ¶ 16.) The parties dispute what took place at that meeting. Litéra and Massand's Estate contend that evidence Martinez seeks to admit regarding that meeting and subsequent conversations with Massand is barred by North Carolina Rule of Evidence Rule 601(c), commonly referred to as the "Dead Man's Statute." (Mot. Strike 1.)

17.     Martinez contends that she requested the meeting, did not tell Massand the purpose of the meeting in advance, and asked that he keep the meeting and information disclosed during the meeting confidential. (Martinez Aff. ¶ 14.) Martinez asserts that, during the meeting with Massand, she presented the video and PowerPoint presentation described above and disclosed—for the first time to anyone—the architectural designs for Wormhole. (Martinez Aff. ¶¶ 2, 18.) In addition to her request to keep all information confidential, Martinez asked Massand "to keep the whiteboard drawing of [her] Wormhole technology hidden from sight so that no Litéra employee would see the contents." (Martinez Aff. ¶ 18.) Martinez did not request that Massand sign a confidentiality or non-disclosure agreement.

18.     Martinez contends that, after she disclosed Wormhole to Massand, she and Massand, on behalf of Litéra, entered into an oral agreement, which she refers

to as the "Development Agreement."  The Development Agreement allegedly provides that "Wormhole . . . would be implemented in a Litéra product" that Martinez "would retain the rights to," but that she would grant Litéra "an exclusive license to sell the resulting Litéra product for royalty payments based on gross revenues."  (Martinez Aff. ¶ 19.)  Additionally, Martinez contends that Massand agreed that "Litéra would file a patent application" for Wormhole and "absorb the cost of the patent, development, and marketing fees," but Martinez "would be the owner of the patent," and "the sole inventor" listed on the patent.  (Martinez Aff. ¶ 19.)  Finally, Martinez contends that Massand agreed to have the Development Agreement "memorialized in writing."  (Martinez Aff. ¶ 19.)

19.  No Development Agreement was ever reduced to writing.  (Martinez Dep. 108:7–10.)  Although Martinez's regular practice was to take notes regarding meetings or "anything to do with Litéra business," (Martinez Dep. 154:4–5,) she does not have any notes regarding the December 27, 2011 meeting or the Development Agreement (Martinez Dep. 109:25–110:2.)  Martinez did not tell anyone about the alleged Development Agreement during her employment with Litéra.  (Martinez Dep. 109:6–13.)  Martinez first disclosed her contention of this alleged oral agreement in March 2013 in a conversation with her attorney.  (Martinez Dep. 109:6–9; *see* Am. Countercls. ¶¶ 60–61.)

20.  Litéra asserts that it "has never entered into an agreement that includes [such] terms."  (Domnick Aff. ¶ 7.)  Litéra contends that, during the December 27, 2011 meeting, Martinez described a "problem of custody control" that UBS had with

collaborative software, and that in response Massand proposed a solution to this problem. (Litéra Corp.'s and Deepak Massand's Answers, Resps., and Objs. to First Set Interrogs. ("Interrog. Resp.") ¶ 15.) Litéra contends that "Massand guided Martinez on the specifications of the design" for Wormhole and "the specifications of the design" for a new collaboration software platform. (Interrog. Resp. ¶ 3.) Litéra contends that Martinez recorded Massand's instructions on the whiteboard. (Interrog. Resp. ¶¶ 3, 15; *see also* Compl. ¶ 16.) Massand requested that Martinez, as Litéra's Executive Director of Research and Development, continue to work on the project and "prepare formal versions of the diagrams . . . illustrate[d] on the whiteboard." (Compl. ¶ 17; *see also* Interrog. Resp. ¶¶ 3, 15.)

21. Litéra Galaxy is a Litéra software that incorporates Wormhole and Litéra IDS, a patented document collaboration software that Litéra has a license to use. (Domnick Aff. ¶¶ 4–6; Interrog. Resp. ¶¶ 3, 15; *see also* Martinez Aff. ¶ 23.)

### E. The Development of Wormhole and Litéra Galaxy

22. The parties agree that Martinez continued to develop Wormhole and incorporated it into Litéra Galaxy during her employment at Litéra. (*See* Compl. ¶¶ 19–21; Martinez Aff. ¶ 23.) Litéra contends that such work was within the scope of Martinez's employment as Executive Director of Research and Development and was governed by her signed Agreements. Martinez contends that her work on Wormhole was outside the scope of her employment, because she "worked in [her] spare time editing [her] architectural designs [of Wormhole] so that Litéra could begin developing" Litéra Galaxy. (Martinez Aff. ¶ 23; *see also* Martinez Dep. 50:10–

52:9.) Martinez admits that developing Litéra Galaxy was a part of her job duties, but attempts to distinguish the two projects by contending that she worked on "Litéra business during the day" and on Wormhole at night, during her personal time. (Martinez Dep. 51:1–2.) Martinez contends that her Employment Agreement only applied to work she completed between 9:00 a.m. and 5:00 p.m., but admits that no one ever told her that. (Martinez Dep. 51:20–52:1.)

23. In January 2012, Martinez sent Grossman the architectural designs for Wormhole and sought his suggestions regarding "security aspects" of the technology, without securing any confidentiality agreement. (Pl.'s Br. Supp. Mot. Summ. J. Exs. A, B.)

24. Martinez assisted Litéra's attorneys, who were preparing the patent application for Wormhole, "by providing technical information about . . . Wormhole." (Martinez Aff. ¶ 24). While reviewing a draft of the patent application, Martinez noticed that Massand was named as the sole inventor. Martinez contends that she confronted Massand and that he assured her that Litéra would correct the mistake and name her as the inventor of Wormhole. Martinez contends that she continued to assist patent counsel because she was required to do so pursuant to a term of the Development Agreement. (*See* Martinez Aff. ¶ 24.) Litéra contends that Martinez assisted patent counsel because she was required to under her Employment Agreement. (Compl. ¶ 22; *see* Confidentiality Agreement § 1(c).)

25. On March 19, 2012, Massand filed a patent application, U.S. Patent Application No. 13/423805, naming Massand as the sole inventor of Wormhole

("Massand Application"). He then assigned the Massand Application to Litéra. (Compl. ¶ 7; Domnick Aff. ¶ 6.)

26. Litéra Galaxy is the only Litéra product that uses Wormhole, and Litéra has been unable to sell it. (Domnick Aff. ¶ 9.)

## F. Martinez's Resignation and Post-Resignation Actions

27. On April 24, 2012, Massand and Martinez had a meeting regarding Martinez's work performance. (Am. Countercls. ¶ 47; Reply ¶ 47.) After further email discussion, on May 17, 2012, Martinez's position was changed to Director of Special Projects, maintaining her salary but reducing her responsibilities. (Martinez Aff. ¶ 26; Pl.'s Br. Supp. Mot. Summ. J. Ex. D; *see also* Domnick Aff. ¶ 8.) On May 21, 2012, Martinez resigned from Litéra and declined the severance package offered to her. (Martinez Aff. ¶ 27; Martinez Dep. Ex. 16.)

28. Martinez admits that she took documents and emails from her Litéra computer regarding "[t]he [Wormhole] product information." (Martinez Dep. 81:24.) She contends that the documents concerning Wormhole "belong[ ] to [her]," because she "created the [Wormhole] product prior to [her] employment with Litéra," and "[e]verything [she] created during Litéra was based off the product that was created prior to Litéra." (Martinez Dep. 81:22, 82:6–10.)

29. Specifically, Martinez admits that she retained a draft of the Massand Application and the emails exchanged between Litéra personnel and attorneys who were preparing the Massand Application. (Martinez Dep. 90:4–16, 150:9–12, 151:5–14, 153:1–6.) Martinez claims she had a right to those documents because she

believed that the attorneys represented her, but admits that she was not paying the attorneys and that "[t]hey were working for Litéra." (Martinez Dep. 94:17; *see also* Martinez Dep. 94:2–25.)

30.  On March 15, 2013, Martinez filed her own patent application for Wormhole ("Martinez Application"). (Martinez Aff. ¶ 29.) Litéra contends that the Martinez Application "copied verbatim from the Massand Application," and separately disclosed "concepts that are unique to the patented Litéra IDS," which is indisputably licensed to Litéra. (Compl. ¶ 25; *see also* Domnick Aff. ¶ 4; Am. Countercls. ¶ 14.) Litéra contends that Martinez's Application disclosed Litéra's confidential documents that had not previously been filed with the United States Patent and Trade Mark Office ("USPTO"), including (1) documents from the December 27, 2011 meeting, (2) May 2012 Wormhole "design documents," and (3) documents concerning Litéra IDS specifications. (Domnick Dep. 173:21–174:8; Second Domnick Aff. ¶ 10.) The record makes clear that Martinez took and disclosed documents that were created and finalized during the period in which Martinez was employed by Litéra and documents that disclose technology beyond Wormhole. (Martinez Dep. 151:15–153:6, 156:16–20; *see* Martinez Dep. Ex. 39.)

31.  The Massand Application was published on September 19, 2013. (Martinez Aff. ¶ 28.) On June 6, 2014, Martinez filed her suggestion of interference between the Massand Application and Martinez Application. (Martinez Aff. ¶ 29.) Because the Massand Application was filed prior to the effective date of the America Invents Act ("Act"), the competing patent applications are not subject to the

first-to-file system created by that Act. *See* Leahy-Smith America Invents Act, Pub. L. No. 112-29, sec. 35, § 102, 125 Stat. 284, 285 (2011) (codified as amended at 35 U.S.C. § 102 (2012)). To the Court's knowledge, the USPTO has not yet ruled on the interference claim.

### III. PROCEDURAL HISTORY

32. On June 9, 2014, Litéra filed its Complaint against Martinez alleging claims for breach of contract and misappropriation of trade secrets. The action was designated as a mandatory complex business case on August 5, 2014, and assigned to the undersigned on August 8, 2014.

33. On September 2, 2014, Martinez filed her answer, counterclaims, and third-party complaint against Massand. Litéra and Massand filed their Motion to Dismiss, Reply to the Counterclaim, and Answer to the Third-Party Complaint on October 6, 2014.

34. Martinez amended her counterclaims and third-party complaint on March 20, 2015, asserting seven counterclaims and six third-party claims, including (1) breach of contract, (2) fraud, or alternatively, negligent misrepresentation, (3) unjust enrichment, in the alternative, (4) misappropriation of trade secrets, (5) constructive trust, (6) declaratory judgment, and (7) punitive damages. All claims other than the breach of contract claim are alleged against both Litéra and Massand. Litéra and Massand filed their reply and answer on April 22, 2015.

35. On March 11, 2016, Martinez filed Defendant's Motion to Substitute Parties, which requested that Karen Kenefick-Massand and Raina Massand,

Executrices of the Estate of Deepak Massand, be substituted as third-party defendants in place of Massand. The Court granted the Motion to Substitute Parties on March 28, 2016.

36. On April 27, 2016, Litéra and Massand's Estate moved for summary judgment. They seek summary judgment that Litéra is entitled to recover on Litéra's affirmative claims and that Martinez's counterclaims and third-party claims should be dismissed.

37. On June 14, 2016, Litéra and Massand's Estate filed their Motion to Strike.

38. The Court heard argument on the Motion and the Motion to Strike on August 24, 2016. After the hearing, both parties submitted supplemental briefs to address the relevance of the hired-to-invent doctrine to the application of Rule 601(c) in this case.

39. The Motion and Motion to Strike are now ripe for determination.

## IV.    ANALYSIS

40. The Motion presents a threshold issue of subject matter jurisdiction. The Court concludes that it has subject matter jurisdiction over Litéra's claims, which do not arise under federal patent law, but does not have subject matter jurisdiction over Martinez's counterclaims and third-party claims, which arise under federal patent law.

## A. Patent Law Is an Essential Element to All of Martinez's Claims.

41.     The Court has no jurisdiction over any claims that arise under federal patent law.  28 U.S.C. § 1338(a) (2012).  A case "arises under" federal patent law when the "well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims."  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988); *see also Gunn v. Minton*, 133 S. Ct. 1059, 1065 (2013) (clarifying the standard to determine whether a state law claim arises under federal law by articulating a four-part inquiry.)  The mere existence of a patent law issue does not necessarily mean that the claim arises under federal patent law.  *AT&T Co. v. Integrated Network Corp.*, 972 F.2d 1321, 1325 (Fed. Cir. 1992) (quoting *Consol. World Housewares, Inc. v. Finkle*, 831 F.2d 261, 265 (Fed. Cir. 1987)).

42.     Litéra and Martinez assert claims nominally stated as state law claims.  However, any claim that necessarily requires resolution of the inventorship dispute depends upon patent law.  *See HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co.*, 600 F.3d 1347, 1354 (Fed. Cir. 2010).  Litéra contends that Martinez's claims are subject to exclusive federal jurisdiction because they "necessarily depend[ ]" on resolving the inventorship dispute, which is a "substantial question of federal patent law."  *Christianson*, 486 U.S. at 809.  Martinez counters that to prevail she only has to establish that she owned Wormhole before beginning work with Litéra and that

ownership is not a per se patent law issue. *See CamSoft Data Sys., Inc. v. S. Elecs. Supply, Inc.*, 638 F. App'x 255, 263 (5th Cir. 2015).

43.     Whether a claim depends on a substantial question of patent law "must be determined from what necessarily appears in the [party's] statement of his own claim." *Christianson*, 486 U.S. at 809 (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 10 (1983)).  A party cannot plead around a defect in subject matter jurisdiction and "cannot avoid federal patent jurisdiction by leaving out an element necessary to the success of his claim." *E.I. Du Pont de Nemours & Co. v. Okuley*, 344 F.3d 578, 581 (6th Cir. 2003) (citing *Christianson*, 486 U.S. at 809).  "If 'on the face of a well-pleaded complaint there are . . . reasons completely unrelated to the provisions and purposes of [the patent laws] why the [party] may . . . be entitled to the relief it seeks,'" then the claim does not arise under patent law. *Christianson*, 486 U.S. at 810 (first alteration in original) (quoting *Franchise Tax Bd.,* 463 U.S. at 26).  If, however, the only theories upon which a party can prevail require the determination of a patent law issue, then patent law is essential to the claim, and the Court does not have jurisdiction. *See id.* at 811–12.

44.     Here, the critical issue is whether the claims of either party necessarily depend upon the issue of inventorship.  It is well established that "inventorship is a unique question of patent law" that cannot be adjudicated by state courts. *HIF Bio, Inc.*, 600 F.3d at 1353.  The fact that inventorship may be relevant to a dispute is not dispositive; rather the inquiry is whether "the only possible theory upon which relief

could be granted . . . would be one in which determining the true inventor(s) of competing patents is essential," in which event the claim arises under patent law. *Id.*

45. In *HIF Bio, Inc. v. Yung Shin Pharmaceuticals Industrial Co.*, the Federal Circuit held that the plaintiffs' slander of title claim arose under patent law because the only alleged "theory which entitle[d] plaintiffs to relief" was that "they invented the INVENTION first and that defendants' public statements of inventorship are false and caused the plaintiffs' damage." *Id.* at 1355. The Federal Circuit held that the plaintiffs' declaration of ownership claim did not arise under patent law, because the plaintiffs' ownership claim was based on an implied contract between the parties arising from the employment agreement and did not require the issue of inventorship to be resolved. *Id.* at 1356–57.

46. Martinez correctly notes that inventorship and ownership are two distinct issues. *See Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993). "[I]nventorship is a question of who actually invented the subject matter claimed in a patent," whereas "[o]wnership . . . is a question of who owns legal title to the subject matter claimed in a patent, patents having the attributes of personal property." *Id.* "[T]he legal distinction between inventorship and ownership does not, by itself, determine whether a [state] court has jurisdiction over a claim of ownership." *CamSoft Data Sys.*, 638 F. App'x at 263. In fact, "[t]he Federal Circuit has made clear that an ownership claim may, in some circumstances, turn on the question of inventorship." *Id.*

47. If a party's claim of ownership arises based on an express assignment contract or an implied-in-fact contract then state law controls, and the claim does not involve a question of federal patent law. *Morris v. Scenera Research, LLC*, No. 09-CVS-19678, 2012 NCBC LEXIS 1, at *16 (N.C. Super. Ct. Jan. 4, 2012) ("Federal patent law regulates who is the inventor, but once the fact and author of inventorship is established, ownership of patent rights . . . is governed by state law."); *see, e.g.*, *Speck v. N.C. Dairy Found., Inc.*, 311 N.C. 679, 686, 319 S.E.2d 139, 143 (1984) (explaining that ownership automatically vested with the employer, not the inventor-employees, by an implied-in-fact contract because the invention resulted directly from the employees' job duties). In contrast, if a party's claim of ownership depends entirely on the assertion that he invented the technology, then the "ownership claim . . . turn[s] on the question of inventorship" and federal patent law controls. *CamSoft Data Sys.*, 638 F. App'x at 263.

48. Martinez offers no evidence, and makes no contention, regarding any express or implied contract preceding her employment with Litéra that vests her with ownership of Wormhole. Martinez claims that the Development Agreement gives her a contractual right to ownership of the patent, but the Development Agreement is only valid if she can establish she owned Wormhole, because her invention is her only purported consideration for the agreement.

49. Martinez claims that she owns Wormhole because she created it and had full possession of it prior to being employed by Litéra. (Am. Countercls. ¶ 18; *e.g.*, Def.'s Br. Opp'n to Mot. Summ. J. 10.) The only basis on which she would have such

ownership would be that she invented the technology. Martinez has presented evidence in support of her contention that she invented Wormhole, including entries in her "Idea Journal" made prior to her employment at Litéra that allegedly depict "[t]he architectural designs of [her] Wormhole technology." (Martinez Aff. ¶ 12.) Her claim of ownership "turns on the question of inventorship." *CamSoft Data Sys.*, 638 F. App'x at 263. As there is no other basis on which Martinez can prove ownership, the Court does not have subject matter jurisdiction over her claim to ownership, and any claim that requires Martinez to establish ownership to prevail must be dismissed.

50. The Court has separately assessed whether Martinez has any counterclaims or third-party claims that do not depend upon her establishing ownership of Wormhole, which in turn depends upon inventorship, and concludes that she does not. Therefore, all her claims must be dismissed.

### (1) Martinez's breach of contract counterclaim

51. Martinez claims that, by filing a patent application on which Massand was listed as the sole inventor, Litéra breached the oral Development Agreement, which was either a valid and enforceable independent contract, or alternatively a valid oral modification of her Employment Agreement. Litéra responds with three alternative assertions: (1) first, even assuming, *arguendo*, that there was a Development Agreement, it was invalid because it lacked consideration; (2) second, any such agreement was unenforceable because it is barred by both the statute of frauds and the provision in the Employment Agreement prohibiting an oral

modification; and (3) third, Rule 601(c) of the North Carolina Rules of Evidence prohibits the admission of the oral statements on which Martinez bases her claim.

52.     To establish a claim for breach of contract Martinez must establish "(1) [the] existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). "Formation of a valid contract 'requires an offer, acceptance and consideration.'" *Kinesis Advert., Inc. v. Hill*, 187 N.C. App. 1, 11, 652 S.E.2d 284, 292 (2007) (quoting *Cap Care Grp., Inc. v. McDonald*, 149 N.C. App. 817, 822, 561 S.E.2d 578, 582 (2002)).

53.     Martinez asserts that her consideration for the Development Agreement was disclosing Wormhole to Litéra and allowing Litéra to use Wormhole in a Litéra product. For Martinez's disclosure of Wormhole to be valid consideration she must establish that she owned Wormhole and had the legal right to bargain with it. Even if Martinez invented Wormhole while she was employed at Litéra, her promise to grant Litéra exclusive licensing rights to sell a Litéra Wormhole product was not valid consideration because her Employment Agreement already required her to grant Litéra such rights. *See Brown v. Owens*, 181 N.C. 18, 19, 105 S.E. 817, 817 (1921). ("[A]s a general rule, the performance of, or promise to perform, an existing legal obligation is not a valid consideration."). To prevail on her contract claim, Martinez must prove she owned Wormhole before she began her employment with Litéra. As stated above, establishing ownership of Wormhole depends upon the issue of inventorship. Therefore, Martinez's breach of contract claim arises under federal patent law and must be dismissed.

### (2) Martinez's misappropriation of trade secrets claims

54. Martinez claims that Litéra and Massand misappropriated her trade secrets by filing a patent application that disclosed Wormhole. Section 66-153 of the North Carolina General Statutes provides that "[t]he *owner* of a trade secret shall have remedy by civil action for misappropriation of his trade secret." N.C. Gen. Stat. § 66-153 (2015) (emphasis added). Therefore, to prevail on this claim Martinez must establish that she owns Wormhole.

55. As noted above, her ownership claim depends upon inventorship. Thus, Martinez's misappropriation of trade secrets claims arise under federal patent law and must be dismissed.

### (3) Martinez's fraud and negligent misrepresentation claims

56. Martinez claims that Massand, individually and on behalf of Litéra, made fraudulent misrepresentations that she relied upon when she decided "to disclose [her] proprietary information and trade secrets, which she had developed prior to her employment with Litéra." (Am. Countercls. ¶ 72.) To establish a claim for fraud, Martinez must establish "(1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with the intent to deceive; (4) which [she] reasonably relie[d] upon; (5) resulting in damage to [her]." *Liggett Grp., Inc. v. Sunas*, 113 N.C. App. 19, 30, 437 S.E.2d 674, 681 (1993).

57. Martinez claims that she would not have disclosed Wormhole to Massand, but for his representations that Litéra would file a patent application naming her as the sole inventor, give her ownership of the patent, and pay her

royalties from the gross revenue of any Litéra products that use Wormhole. (Am. Countercls. ¶ 81.) To prevail on this claim, Martinez must establish that Massand's alleged false representations caused her damage. The only damage she allegedly suffered was disclosing her proprietary information—Wormhole. To establish that Wormhole is her proprietary information Martinez must establish that she invented Wormhole prior to her employment with Litéra. Thus, her fraud and negligent misrepresentation claims arise under federal patent law and are matters of exclusive federal subject matter jurisdiction.

**(4) Martinez's unjust enrichment claims**

58. The first element necessary to establish a claim for unjust enrichment is that Martinez conferred a benefit upon Litéra and Massand. *See Butler v. Butler*, 239 N.C. App. 1, 7, 768 S.E.2d 332, 336 (2015). Martinez contends that she conferred a benefit upon Litéra and Massand "[b]y agreeing to disclose her confidential ideas, proprietary information, and trade secrets" and by agreeing to "develop and promote products for Litéra, and assist with the preparation of a patent application incorporating [Wormhole]." (Am. Countercls. ¶ 80.) Once again, this claim depends upon Martinez establishing that Wormhole is her proprietary information, which requires Martinez to establish that she invented Wormhole prior to her employment with Litéra. Based on the facts of this case, Martinez's unjust enrichment claim arises under federal patent law and must be dismissed.

### (5) Martinez's declaratory judgment claims

59.    Martinez seeks a declaratory judgment that "she has no liability to [Litéra] for breach of any agreements," "that she has no obligation to assign any patent applications or patents to either [Litéra] or Massand," and that she "is the owner of the patent applications and patents issuing therefrom." (Am. Countercls. ¶ 99.) Martinez also seeks a declaratory judgment that Litéra "has no enforceable trade secrets." (Am. Countercls. ¶ 99.) Essentially, Martinez seeks a declaratory judgment that she is not liable for Litéra's claims because she, not Litéra, owns Wormhole. Again, because inventorship is an essential element of her claims, the claims arise under federal patent law, and this Court has no jurisdiction.

### (6) Martinez's constructive trust and punitive damages claims

60.    Martinez's claims for a constructive trust and punitive damages are dependent on her claims for fraud and misappropriation of trade secrets. Accordingly, these claims are dismissed.

61.    In sum, the Court concludes that each of Martinez's claims arise under federal patent law because the inventorship dispute must be resolved for Martinez to prevail. Accordingly, her claims must be dismissed for lack of subject matter jurisdiction.

### B.  The Court Has Jurisdiction over Litéra's Claims Because Neither of Its Claims Require the Court to Determine Who Invented Wormhole.

62.    Litéra seeks summary judgment on its own claims. The Court must have subject matter jurisdiction over those claims to grant such relief. The Court concludes that Litéra's claims do not depend entirely on the issue of inventorship and

therefore do not arise under federal patent law, but that there are material factual disputes that preclude summary judgment in Litéra's favor.

63. Litéra asserts claims against Martinez for breach of contract and misappropriation of trade secrets. To prevail on its breach of contract claim, Litéra must establish, first, that the Employment Agreement and Confidentiality Agreement are valid contracts, and second, that Martinez breached the terms of the Agreements. *See Poor*, 138 N.C. App. at 26, 530 S.E.2d at 843.

64. Litéra contends that Martinez breached the Confidentiality Agreement and misappropriated Litéra's trade secrets by retaining and then publicly filing Litéra's confidential documents, which contain "information regarding the development and design of Litéra products that are not disclosed in the Massand Application." (Second Domnick Aff. ¶ 10.) Litéra also contends that Martinez breached the assignment provisions of both Agreements when she filed the Martinez Application claiming rights in Wormhole. (Compl. ¶ 36.)

65. Although the issue of inventorship may be relevant to an ownership claim based on an employment agreement containing hired-to-invent provisions, it is not controlling, and therefore, such an ownership claim is a matter of state law rather than federal law. In *AT&T Co. v. Integrated Network Corp.*, the plaintiff-employer contended that its former employees breached their employment contract and misappropriated trade secrets by filing a patent application for an invention that the employer contended the employees invented during the course of their employment and by assigning that patent to their subsequent employer. 972 F.2d at 1322. The

dispute concerned which employer was entitled to the patent rights in the invention, which depended on when the invention was made. *Id.* The issue of whether the four employees were the inventors was apparently not contested. *Id.* at 1322–23. Similar to Litéra's Agreements, AT&T's employment contract provided that any invention "made or *conceived . . .* in the course of such employment" shall be assigned to the employer. *Id.* at 1323. The Federal Circuit explained that the two contested issues were (1) interpreting what was meant by the contractual language of inventions "conceived" and (2) determining when the invention was conceived. *Id.* at 1324. The court held that neither of those issues required determining inventorship under federal patent law and that, because AT&T could prevail on its breach of contract and misappropriation of trade secrets claims without having to address an exclusive issue of patent law, the claims did not lie in the federal court's exclusive jurisdiction. *Id.*

66. Unlike in *AT&T*, here, the question of who invented Wormhole is disputed. But like in *AT&T*, Litéra's claims depend on interpreting the contract between the parties and do not necessarily depend on establishing who invented Wormhole. Litéra asserts, and may be entitled to recover by proving, that Martinez wrongfully obtained and disclosed various documents that constitute Litéra's confidential information, as defined by the Confidentiality Agreement. The Confidentiality Agreement defines confidential information as "all trade secrets, technical information, processes, computer programs, . . . designs, drawings, . . . [and] 'Employee Work Product.'" (Confidentiality Agreement § 1(b).) Litéra asserts that Martinez retained and disclosed (1) documents containing information regarding

Litéra IDS, (2) documents containing information regarding Litéra Galaxy, (3) emails between Litéra and its attorneys, and (4) documents containing information regarding Wormhole. Litéra contends that Martinez's retention and disclosure of documents from any one of these four categories constitutes a breach of the Confidentiality Agreement and a misappropriation of Litéra's trade secrets. Because Litéra can prevail on its claims by establishing that Martinez disclosed confidential documents related to Litéra IDS and Litéra Galaxy, which does not require resolving the Wormhole inventorship dispute, Litéra's claims do not fall within the federal court's exclusive jurisdiction, and this Court is not divested of subject matter jurisdiction over those claims.

67. Litéra also asserts that Martinez breached the Agreements when she filed a patent application asserting ownership rights in Wormhole. The Employment Agreement states that "[a]ll ideas generated while you are an associate of Litéra, in meetings or as a result of use or exposure to Litéra products or methods, inventions, improvements made to existing Litéra products and offerings remain the intellectual property of Litéra." (Employment Agreement 5.) The Confidentiality Agreement also provides that "all Employee Work Product developed for the employer. . . is owned exclusively by [Litéra]." (Confidentiality Agreement § 1(c).) To prevail on its breach of contract claim based on this theory, Litéra could potentially concede or not challenge Martinez's assertion that she invented Wormhole, but contend that she did so during the course of her employment with Litéra, meaning Litéra has ownership of Wormhole based on the express terms of the Agreements. As *AT&T* explains the

question of when an invention occurs is not necessarily a question of federal patent law. 972 F.2d at 1324. Although Martinez admits that she continued to work on Wormhole and its integration into Litéra's new product, she denies that her work was within the scope of her employment with Litéra. (Martinez Aff. ¶ 23; Martinez Dep. 50:10–52:9.) The questions of what work Martinez completed while employed by Litéra and whether such work was governed by the Agreements present issues of state law that do not depend on determining inventorship.

68.     Admittedly, if Litéra's sole breach of contract theory required determining who invented Wormhole, Litéra's claims might be dismissed on the same basis as Martinez's claims. But "a claim supported by alternative theories in the complaint may not form the basis for [patent law] jurisdiction unless patent law is essential to each of those theories." *Christianson*, 486 U.S. at 810. Here, Litéra's claims for breach of contract and trade secret misappropriation extend beyond the question of whether Martinez was the inventor, and if so, when the invention occurred, because, as discussed above, Litéra presents other theories on which it can prevail. Additionally, the Court's jurisdiction over Litéra's claims is not defeated because Martinez asserts a defense based on her claim of inventorship. *See Franchise Tax Bd.*, 463 U.S. at 14 ("[A] case may not be removed to federal court on the basis of a federal defense . . . even if the defense is anticipated . . . and even if both parties admit that the defense is the only question truly at issue in the case.").

69.     In sum, Litéra's breach of contract and misappropriation of trade secrets claims do not arise under patent law because Litéra can prevail on both claims based

on a theory to which patent law is not essential. Therefore, the Court has subject matter jurisdiction over Litéra's claims.

## C. The Motion Must Be Denied As to Litéra's Claims Because There Are Disputed Issues of Material Facts.

70. Litéra, as the movant, bears the burden of showing that there is no genuine issue of material fact with respect to the essential elements of its claims and that it is entitled to judgment as a matter of law. *See Steel Creek Dev. Corp. v. Smith*, 300 N.C. 631, 636–37, 268 S.E.2d 205, 209 (1980). The Court views the evidence in the light most favorable to Martinez, the nonmovant. *See Coats v. Jones*, 63 N.C. App. 151, 154, 303 S.E.2d 655, 657 (1983), *aff'd*, 309 N.C. 815, 309 S.E.2d 253 (1983). If "genuine issue of fact exists" then Litéra is not entitled to summary judgment on its claims*. Watts v. Cumberland Cty. Hosp. Sys., Inc.*, 75 N.C. App. 1, 6, 330 S.E.2d 242, 247 (1985), *rev'd in part on other grounds*, 317 N.C. 321, 345 S.E.2d 201 (1986).

### (1) Litéra's misappropriation of trade secrets claim

71. To establish a claim for misappropriation of trade secrets Litéra must establish that Martinez "(1) [k]nows or should have known of the trade secret," and (2) "[h]as . . . acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155(1)–(2) (2015). However, "if the information is publicly available or there is no evidence indicating that the owner undertook efforts to ensure the information's secrecy," then it is not a trade secret. *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, No. 13-CVS-1037, 2015 NCBC LEXIS 40, at *26 (N.C. Super. Ct. Apr. 23, 2015) (citing *Bank Travel Bank v. McCoy*, 802 F. Supp. 1358, 1360 (E.D.N.C. 1992)).

72. Litéra contends that Martinez misappropriated its trade secrets by (1) filing documents with the Martinez Application that contain "nonpublic information concerning the design and functionality of Litéra Corp. products" and (2) sharing the architectural designs of Wormhole with Grossman in January 2012. (Compl. ¶ 28.)

73. There is a dispute as to whether Martinez disclosed any information that was not previously disclosed in the Massand Application. The record establishes that the Martinez Application disclosed Wormhole "design documents" completed in May 2012 and documents concerning Litéra IDS, specifically the "Litéra IDS Specification and User Functionality" document and the "Revised IDS User Interface FINAL PPT." (Martinez Dep. Ex. 39, at KONSO216.) However, the developed record does not clearly establish that such documents were confidential because it is unclear if information of this nature was disclosed in the Massand Application so as to render any additional information no longer confidential. Further, there are disputed factual issues as to the relevance, if any, of disclosures that Martinez made in her email to Grossman in January 2012.

74. Because of these disputed issues, Litéra is not entitled to summary judgment on its misappropriation of trade secrets claim.

### (2) Litéra's breach of contract claim

75. Litéra contends that Martinez breached the Confidentiality Agreement by retaining and disclosing confidential information. As discussed above, the record does not clearly establish that the documents Martinez disclosed were confidential

because the Confidentiality Agreement specifically states that "information in the public domain through no wrongful act" of the employee is not confidential. (Confidentiality Agreement § 1(b).)

76.     Litéra also claims that it can prevail on its breach of contract claim based upon a theory that Martinez breached the Agreements when she filed the Martinez Application, claiming an ownership right to Wormhole. This theory raises the separate issue of whether Martinez's work on Wormhole constitutes employee work product. Martinez has presented evidence that such work was performed outside the scope of her regular job duties. (Martinez Aff. ¶ 2.) While the Court admits skepticism as to Martinez's contention, there are disputed issues of material fact that preclude summary adjudication of Litéra's breach of contract claim.

**D. The Motion to Strike Is Denied.**

77.     Litéra and Massand's Estate move to strike "those portions of the transcript of the deposition of Deneen Martinez and the Affidavit of Deneen Martinez regarding oral communications between Martinez and decedent Deepak Massand cited by Defendant," in accordance with North Carolina Rule of Evidence 601(c), commonly referred to as the "Dead Man's Statute," as well as any legal conclusions expressed in the Affidavit of Deneen Martinez. (Mot. Strike 1.)

78.     Because the Court concludes that it does not have jurisdiction over Martinez's claims and that there are genuine disputes of material fact, based on evidence not challenged in the Motion to Strike, that preclude summary judgment in

Litéra's favor on its claims, the Court need not rely upon the contested evidence to rule on the Motion.

79. The Court therefore denies the Motion to Strike without prejudice to a later Motion in Limine that may address the admissibility of such evidence at trial.

## V. CONCLUSION

80. For the foregoing reasons, the Court hereby:

1) GRANTS Plaintiff and Third-Party Defendants' Motion as to Martinez's counterclaims and third-party claims, and those claims are DISMISSED;

2) DENIES Plaintiff and Third-Party Defendants' Motion as to Litéra's affirmative claims for breach of contract and misappropriation of trade secrets; and

3) DENIES the Motion to Strike without prejudice to later consideration of the applicability of Rule 601(c) to evidence to be presented at trial.

IT IS SO ORDERED, this the 19th day of April, 2017.

/s/ James L. Gale
James L. Gale
Chief Business Court Judge